**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

KALIEGH SMITH,                                    CIVIL ACTION NO:

    Plaintiff,                                      JUDGE:

    v.                                              SECTION:

JASON WILLIAMS, in his official capacity as       MAGISTRATE:
District Attorney for Orleans Parish, and
ABC INSURANCE COMPANIES 1-10,                     DIVISION:

    Defendants.


## COMPLAINT

### INTRODUCTION

1.    Kaliegh Smith was imprisoned for nearly 14 years for a murder he did not commit.

2.    The Orleans Parish District Attorney's Office (OPDA) secured Mr. Smith's wrongful conviction by repeatedly violating Mr. Smith's constitutional rights.

3.    OPDA withheld information that was exculpatory and material, in violation of OPDA's obligations under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.

4.    Mr. Smith was indicted in December 2007 on one count of second degree murder for the death of Jason Anderson. On February 6, 2010, an Orleans Parish jury, by the non-unanimous vote of 10 to 2, found Mr. Smith guilty. Mr. Smith was sentenced to the mandatory term of life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence.

5.    At trial, OPDA relied almost entirely on the testimony of Cynthia Shezbie, who the State described as "essentially the witness in this case." Ms. Shezbie both identified Mr. Smith as

1

the man who killed Mr. Anderson, and told the jury that she had received threats not to testify against Mr. Smith. In closing, the lead prosecutor told the jury that if they did not "believe" Ms. Shezbie's testimony then they should find Mr. Smith "not guilty," and further opined three times that Ms. Shezbie had testified truthfully.

6.    But OPDA concealed from both the jury and from Mr. Smith numerous reasons to doubt Ms. Shezbie's testimony.

7.    Undisclosed documents prove that OPDA's Victim Witness Assistance Division (VWA Division) secretly provided $2500 worth of benefits to Ms. Shezbie before she testified, and provided her with an additional $1900 worth of benefits after trial, fulfilling a promise then-District Attorney Leon Cannizzaro personally made to Ms. Shezbie immediately prior to her testimony.

8.    Additionally, an undisclosed log of conversations with Ms. Shezbie, maintained by the VWA Division, contradicted a crucial piece of her testimony: despite statements from the stand that she had received threatening phone calls from the jail regarding Mr. Smith and had reported these calls to OPDA staff, in the numerous conversations notated in the log, Ms. Shezbie had never before mentioned receiving such threats.

9.    Further, OPDA concealed the fact that Ms. Shezbie testified at trial only after having been threatened with imprisonment on a material witness warrant that OPDA had successfully sought and confronted her with.

10.    Contemporaneous notes by OPDA set out a strategy for "protecting" the prosecution's communications with Ms. Shezbie. Acting on this strategy, OPDA compelled Ms. Shezbie to sign a privilege form, entering into a purported attorney-client relationship with its

primary witness—a witness who OPDA obtained leave to arrest in the event she refused to testify. This tactic has since been disclaimed by OPDA as "improper."

11.     The State's notes further document explicit instruction from OPDA leadership not to disclose the contents of their VWA Division file, going so far as to instruct the prosecutors not to proceed with trial should they encounter a ruling that compelled disclosure of any of their VWA Division information.

12.     OPDA's failures to disclose favorable and material evidence to which Mr. Smith was constitutionally entitled did not end with the information regarding Ms. Shezbie.

13.     Additional documents show that no less than three times, an alternate suspect, Waton Hughes, had been implicated in the murder that OPDA prosecuted Mr. Smith for.

14.     The New Orleans Police Department (NOPD) detectives' notes suggested Mr. Hughes' involvement in Mr. Anderson's death, including a report that Mr. Hughes had argued with Mr. Anderson the day before his murder. Documents from NOPD's investigation showed Mr. Hughes fit the description of the killer, had been linked to other shootings, and was believed to be a hitman.

15.     Notes from the OPDA trial prosecutors' own file similarly contained multiple references to Mr. Hughes and suggest that several witnesses indicated that Mr. Hughes may have killed Mr. Anderson.

16.     In May 2021, OPDA confessed its <u>Brady</u> violations in resolution of Mr. Smith's application for post-conviction relief, agreeing that Mr. Smith was "entitled to a new trial due to [the State's] failure to disclose impeachment evidence pertaining to the State's primary witness as well as other exculpatory information suggesting the possibility that a specific third-party may

have been involved in or responsible for the offense." OPDA concluded: "Mr. Smith's conviction is unworthy of confidence."

17.     On May 27, 2021, Mr. Smith's conviction was vacated by the Orleans Parish Criminal District Court. On June 14, 2021, OPDA dismissed all charges against Mr. Smith.

18.     After nearly 14 years in prison, Mr. Smith was released from custody.

19.     OPDA's violation of Mr. Smith's constitutional right to disclosure of exculpatory and material evidence was not an isolated incident. Rather, OPDA maintained an unconstitutional policy, practice, custom, or usage of failing to provide the defendants it prosecuted with the evidence OPDA is required to turn over under Brady and its progeny, and of failing to adequately train and/or supervise OPDA prosecutors in their Brady obligations.

20.     The existence of these policies or customs is revealed by numerous cases in which a court has determined, or OPDA has acknowledged, that OPDA failed to disclose favorable information to a defendant, as well as by statements from OPDA representatives.

21.     In the stipulations provided in resolution of Mr. Smith's post-conviction application, OPDA explicitly credited the Louisiana Fourth Circuit Court of Appeal's observation that there is a "storied, shameful history of local prosecuting authorities' noncompliance with Brady," and recognized the "need to rectify it."

22.     OPDA and its policymakers were on actual or constructive notice that OPDA's policies or customs failed to protect the rights of Mr. Smith and other criminal defendants, but were deliberately indifferent to the known and/or obvious consequence that constitutional violations would result from these policies or customs.

23.     OPDA's policies or customs were the moving force behind the deprivation of Mr. Smith's right to the disclosure of materially favorable information, and deprived him of the due

process guarantees of the United States Constitution. In particular, OPDA's policies or customs were the moving force behind the conviction of Mr. Smith for a crime he did not commit.

24.     This action seeks redress for OPDA's violations of Mr. Smith's rights. Mr. Smith, by and through his attorneys, seeks all relief as detailed throughout this complaint and as requested below.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over Mr. Smith's 42 U.S.C. § 1983 claim pursuant to 28 U.S.C. §§ 1331 and 1343.

26.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## PARTIES

27.     Plaintiff Kaliegh Smith is an adult resident of Orleans Parish, Louisiana. Mr. Smith was wrongfully convicted of second degree murder; sentenced to life imprisonment without the benefit of probation, parole, or suspension of sentence; and served nearly 14 years of that sentence before his release.

28.     Defendant Jason R. Williams is the District Attorney for Orleans Parish and is a final policymaker for OPDA, a government agency located in Orleans Parish, Louisiana.[1] The District Attorney for Orleans Parish is responsible for the unconstitutional policies or customs of OPDA that resulted in OPDA prosecutors failing to abide by their well-established constitutional

---

[1] Jason Williams was elected to the position in 2020 and assumed office in 2021. Williams is the successor to Leon A. Cannizzaro, Jr., who served as District Attorney for Orleans Parish from 2008 to 2021. Cannizzaro was the District Attorney for Orleans Parish during the unconstitutional prosecution and conviction of Mr. Smith, and remained District Attorney during the post-conviction years of OPDA's continued failure to disclose information to Mr. Smith in violation of its Brady obligations. Cannizzaro succeeded Eddie J. Jordan, Jr., as District Attorney. Jordan served in this role from 2003 until his resignation in October 2007. Following Jordan's resignation, both Keva Landrum and Bobby Freeman served as interim District Attorney until Cannizzaro assumed office.

obligations, causing Mr. Smith's wrongful conviction and imprisonment. Williams is sued in his official capacity only.

29.     Defendants ABC Insurance Companies 1-10 are as-yet unknown insurance companies who may have issued and currently have in effect one or more policies of insurance covering Defendant Williams and/or OPDA and/or the actions complained of herein. These policies obligate Defendants ABC Insurance Companies 1-10, jointly and/or severally, to pay on behalf of or to indemnify Defendant Williams and/or OPDA any sums the insureds may become obligated to pay Mr. Smith.

## FACTUAL BACKGROUND

### I.     The Murder of Jason Anderson

30.     Around noon, on Saturday, October 20, 2007, Cynthia Shezbie was sitting in a driveway in New Orleans East when she heard gunshots.

31.     Looking up, she saw neighbor Jason Anderson struggling in the street with the man who shot him.

32.     Mr. Anderson fell to the ground and died at the scene.

### II.     Mr. Smith's Wrongful Conviction

33.     In the days following the murder, NOPD asked Ms. Shezbie to identify the man she saw struggling with Mr. Anderson. Under circumstances that remain in dispute, Ms. Shezbie "picked the photograph of [Kaliegh] Smith because [she] recognized him from the neighborhood." Following this identification, NOPD arrested Mr. Smith, who protested his innocence.

34.     By late December 2007, OPDA obtained an indictment of Mr. Smith for Mr. Anderson's murder. OPDA sought this indictment despite the fact that Mr. Smith did not match the physical description of the killer; OPDA lacked any meaningful evidence corroborating Mr.

Smith's involvement or any inculpatory forensic results; and clear leads pointed to someone else's guilt.

35.    Long before OPDA prosecuted Mr. Smith, federal law had clearly established the types of information that the State is constitutionally obligated to provide to defense counsel in criminal proceedings under Brady and its progeny.

36.    During NOPD's investigation of the death of Mr. Anderson, Ms. Shezbie told the detectives that Mr. Anderson had a disagreement the day before his murder with a man identified as Waton Hughes. NOPD did not pursue this lead.

37.    In December 2007, as part of its initial screening of the case against Mr. Smith, OPDA interviewed Ms. Shezbie and Latasha Horace, Mr. Anderson's girlfriend. During these interviews, OPDA also received information implicating Waton Hughes in the murder of Mr. Anderson. Mr. Hughes fit the description of the shooter that Ms. Shezbie had provided, was known to be a hitman suspected in other murders in New Orleans East, and was in the area on the day of the crime.

38.    The suggestion that Waton Hughes was the man who had killed Mr. Anderson was later corroborated by an interview of yet another witness who told OPDA that Waton had "something to do w[ith] it," as recorded by OPDA interview notes.

39.    Neither before nor during trial did OPDA disclose to Mr. Smith that several witnesses implicated Mr. Hughes in Mr. Anderson's murder.

40.    A few weeks after Ms. Shezbie was interviewed by OPDA, the Victim Witness Assistance Division (VWA Division) of OPDA contacted Ms. Shezbie. And by February 2008, the VWA Division had obtained approval to provide Ms. Shezbie $2500 to cover her deposit and first month's rent for a house in Georgia.

41.     Neither before nor during trial did OPDA disclose to Mr. Smith that it had provided Ms. Shezbie with this financial benefit.

42.     In May 2009, Ms. Shezbie informed OPDA that she did not want to be a witness in OPDA's prosecution of Mr. Smith. Ms. Shezbie reiterated this sentiment in July 2009.

43.     In January 2010, OPDA sought a continuance of Mr. Smith's trial date, representing that OPDA could not locate Ms. Shezbie and that the prosecution had recently heard from some of her family members that Ms. Shezbie did not want to participate in the trial.

44.     But the prosecution did not disclose that, for the last several months, Ms. Shezbie had been consistently reporting to OPDA her desire not to testify in their prosecution of Mr. Smith.

45.     In addition to the continuance, OPDA sought and obtained a material witness warrant for Ms. Shezbie with a $200,000 bond.

46.     On January 26, 2010, Ms. Shezbie recanted her identification of Mr. Smith during a conversation with the lead prosecutor. The following day OPDA notified Mr. Smith's counsel of Ms. Shezbie's statement that Mr. Smith was "definitely not the guy."

47.     The trial of Mr. Smith began a week after this recantation.

48.     OPDA was concerned that Ms. Shezbie would not testify in accordance with her initial identification of Mr. Smith, and that she may not testify at all.

49.     According to Ms. Shezbie, law enforcement was coming to her house "every few days leading up to the trial," to "harass [her] into testifying against [Kaliegh] Smith."

50.     On February 4, 2010, the third day of trial, Ms. Shezbie agreed to go to OPDA's office. According to Ms. Shezbie, when she arrived, she was informed of the material witness warrant for her arrest and told she "could either go to court or go to jail."

51.     Before she testified, Ms. Shezbie "was taken to a room on the third floor of the courthouse." In the discussion that ensued, District Attorney Leon Cannizzaro told another woman in the room "to make sure [Ms. Shezbie] got whatever [she] needed after the trial." The VWA Division coordinator's log from the same day records the agreement: "[p]er supervisor, this office will assist Ms. Shezbie with dep[osit] and first month's rent."

52.     Having been threatened with arrest and offered further financial assistance by OPDA, Ms. Shezbie took the stand and testified for the prosecution at Mr. Smith's trial.

53.     OPDA had not disclosed anything that had happened with Ms. Shezbie that morning at the OPDA office or in the room at the courthouse. While continuing to conceal its initial payment to Ms. Shezbie is February 2008, OPDA did not disclose to Mr. Smith that it had agreed to provide Ms. Shezbie with this additional money immediately before her testimony.

54.     Contrary to her statement to the lead prosecutor the week before trial that Mr. Smith was definitely not the man that she saw kill Mr. Anderson, and after being threatened with arrest and promised more financial benefits by OPDA, Ms. Shezbie testified that Mr. Smith was the person she saw kill Mr. Anderson. Further, she testified that her recantation the week before had resulted from fears of retaliation.

55.     Following Ms. Shezbie's testimony, after questioning by the defense and by the court, the lead OPDA prosecutor agreed to review their VWA Division file. Despite the documents contained in the file that established at least OPDA's monetary payouts to their key witness, as well as the complete absence of any evidence of threats received by Ms. Shezbie, OPDA chose not to disclose this exculpatory, material evidence to Mr. Smith.

56.     Instead, OPDA took action to further secrete this exculpatory information. When trial recessed for the day, senior OPDA employees had Ms. Shezbie sign a form stating that she

understood that her statements to prosecutors and their VWA Division staff were "confidential" and that she "affirmatively prevent[s]" members of OPDA from "disclosing [her] communications to them." The following morning, the State filed motions claiming that any communications Ms. Shezbie made to their prosecutors and their VWA Division staff were covered by "lawyer-client" privilege or were inadmissible.

57.    Contemporaneous notes in OPDA's file instructed "no further disclosure of any info in VWA [Division] file." The instruction was capitalized, underlined, circled, and starred. Other notes in the file directed, with regard to production of the VWA Division file, "[if] any adverse ruling . . .[d]o not proceed w/ trial."

58.    Having covered up evidence undermining Ms. Shezbie's credibility and contradicting her testimony, and having concealed that an alternate suspect had been implicated by multiple witnesses (including Ms. Shezbie), the State told the jury in its closing that they should acquit Mr. Smith if they did not believe Ms. Shezbie and vouched for the truthfulness of her testimony.

59.    A non-unanimous jury voted 10 to 2 to convict Mr. Smith and he received the mandatory punishment of life imprisonment without the possibility of probation, parole, or suspension of sentence.

60.    In March 2010, OPDA, as promised, issued a $1900 payout to Ms. Shezbie. That brought the total payment issued to Ms. Shezbie by OPDA to $4400.

61.    Just as OPDA had not disclosed its February 2008 payout to Ms. Shezbie, OPDA did not disclose to Mr. Smith that it provided Ms. Shezbie with this additional money immediately following trial.

62.     As a result of his wrongful prosecution, conviction, and imprisonment, Mr. Smith suffered injuries and damage. This included, but was not limited to, pain and suffering, mental anguish, emotional distress, lost income, physical illness, inadequate medical care, humiliation, injury to his reputation, psychological damage, and restriction of numerous forms of personal freedom, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, family relations, travel, enjoyment, and expression.

63.     Many of these injuries, harms, and damages have continued even after Mr. Smith's release from prison.

### III.     Mr. Smith's Requests for the Exculpatory Information to Which He Was Constitutionally Entitled and OPDA's Denial of His Requests

64.     OPDA has a constitutional obligation to disclose evidence favorable to the defense.

65.     This obligation includes the requirement to provide exculpatory evidence material to the defendant's guilt or innocence, including information that implicates another person in the crime.

66.     This obligation also includes the requirement to provide evidence that impeaches the credibility of OPDA's witnesses.

67.     Impeachment evidence "includes promises, rewards, and inducements made by the prosecution to its witnesses that might establish the witness's bias in favor of the government." The State's provision of monetary payouts to a witness constitutes impeachment evidence because the knowledge that a witness has a financial incentive to testify for the State has the potential to alter the fact-finder's assessment of that witness's credibility.

68.     Prior to trial, Mr. Smith's defense made repeated and specific requests that OPDA honor its <u>Brady</u> obligations. On January 10, 2008, the defense requested "any" <u>Brady</u> material in its discovery motion. Despite having offered to pay for its key witness's housing just the day

before, on February 8, 2008, OPDA responded: "[n]one known to the State, however, the State is aware of its continuing obligation under Brady and its progeny." OPDA was also already in possession of evidence from multiple witnesses implicating Mr. Hughes in the murder.

69.     On July 1, 2008, the defense followed up with OPDA, again asking for "all" <u>Brady</u> material and specifically including in its request the following as examples of evidence that must be disclosed: (1) "payment" to "key government witnesses;" (2) "information indicating that uncharged third party had committed offense;" and (3) "information that would suggest another person committed offense."

70.     The defense sent yet another specific <u>Brady</u> demand to OPDA weeks before trial.

71.     Despite these repeated efforts, OPDA did not disclose exculpatory and material information to which Mr. Smith was entitled.

### IV.     Mr. Smith Uncovers the Repeated Violations by OPDA of His Constitutional Right to the Disclosure of Material, Favorable Information

72.     Following Mr. Smith's wrongful conviction and sentence, OPDA continued to withhold the evidence that was favorable and material to him.

73.     Years after Mr. Smith's trial, Ms. Shezbie recanted her testimony to Mr. Smith's defense counsel, but she continued to conceal all of the benefits that she had received from OPDA prior to giving her false statements.

74.     In 2019, Mr. Smith's counsel, through a Public Records Law request to NOPD, obtained the detectives' notes implicating Mr. Hughes in the Anderson murder. These records had not been disclosed in response to two prior Public Records Law requests, and had never been provided by OPDA despite its <u>Brady</u> obligations.

75.     In 2020, only through an ancillary lawsuit, Mr. Smith's counsel finally secured access to the OPDA VWA Division file on Ms. Shezbie.

76.     And in 2021, Mr. Smith obtained yet more material, favorable information when the OPDA case file was finally produced to him unredacted, revealing OPDA had unlawfully withheld even more exculpatory evidence than previously uncovered. This <u>Brady</u> material added more weight to Ms. Shezbie's unreliability as the State's key witness, and revealed additional failures by OPDA to disclose information implicating Mr. Hughes in the Anderson murder.

77.     In confessing error and resolving Mr. Smith's application for post-conviction relief, OPDA agreed that, "despite multiple requests from the defense before and during trial for all favorable [evidence], OPDA did not fulfill its obligation to disclose financial support it provided to help Ms. Shezbie relocate."

78.     "The evidence shows that, although an [Assistant District Attorney] reviewed the [VWA Division] file during the trial, the State failed to identify and disclose the favorable evidence contained in it. Instead, it represented that the file contained nothing exculpatory." OPDA concluded that there is "no evidence of any plausible legal justification for the nondisclosure of the impeachment evidence," and that these failures of disclosure constituted a violation of OPDA's <u>Brady</u> obligation.

79.     Further, OPDA found that its "use of the Statement of Privileged Communications to suppress the disclosure of evidence favorable to the defense was improper."

80.     Additionally, OPDA acknowledged that it failed to disclose to Mr. Smith evidence "pointing to the possibility of an alternate or additional suspect, Mr. Waton Hughes." "[T]he references to him in both the lead detective's notes and several prosecutors' notes suggest that several witnesses thought he may have been involved in [Mr. Anderson's] murder."

81.     "[V]iewed collectively and in light of the State's other failures to disclose exculpatory information – as they must be viewed – the State agree[d] that" its nondisclosures related to Waton Hughes were "significant."

82.     OPDA agreed that Mr. Smith was "entitled to a new trial due to [OPDA's] failure to disclose impeachment evidence pertaining to the State's primary witness as well as other exculpatory information suggesting the possibility that a specific third-party may have been involved in or responsible for the offense."

**V.      OPDA's Longstanding Policy or Custom of Violating the Constitutional Rights of Defendants by Repeatedly Failing to Disclosure Favorable, Material Information**

83.     In its 1995 decision in <u>Kyles v. Whitley</u>, overturning a capital conviction due to "so many instances of [OPDA's] failure to disclose exculpatory evidence," the U.S. Supreme Court criticized OPDA for "blatant and repeated violations" of <u>Brady</u>, and warned of a "system of prosecution" that could "descend to a gladiatorial level unmitigated by any prosecutorial obligation for the sake of the truth."

84.     OPDA's repeated failure to disclose favorable information to Mr. Smith was not an isolated incident. On the contrary, it is one instance in an extensive pattern of similar constitutional violations by OPDA that started many years before Mr. Smith's conviction and continued after.

85.     OPDA has maintained and carried out an unconstitutional policy or custom of violating the rights of the defendants it prosecutes by failing to disclose information that is favorable to them.

86.     Further, OPDA has failed to adequately train, supervise, and/or discipline OPDA prosecutors with respect to their <u>Brady</u> obligations.

87.     OPDA and its policymakers were on actual or constructive notice that OPDA's policies or customs failed to protect the rights of Mr. Smith and other criminal defendants, but

were deliberately indifferent to the known and/or obvious consequence that constitutional violations would result from these policies or customs.

88.     In its stipulations in response to Mr. Smith's application for post-conviction relief, OPDA credited a 2017 opinion of the Louisiana Fourth Circuit Court of Appeal that noted "the storied, shameful history of the local prosecuting authorities' noncompliance" with its duty to disclose exculpatory and material evidence under Brady and its progeny.

89.     Indeed, in the same May 2021 filing, OPDA pointed to this "history" of the office, and recognition of the "need to rectify" it, as the impetus for creation of a new Civil Rights Division. It was this division of OPDA that reviewed Mr. Smith's case, investigated the allegations that OPDA withheld favorable information, and concluded that "OPDA failed to abide by its constitutional duties to disclose material favorable information and thereby violated Mr. Smith's rights."

90.     A report of exonerations in the United States from 1989 to 2012 identified Orleans Parish as having the highest rate of exonerations per capita of any major metropolitan area in the country. That rate is more than 13 times the national average.

91.     Another report looked at the 36 death sentences secured by OPDA under District Attorney Harry Connick, Sr. (between 1973 and 2002). Evidence favorable to the defense was withheld in 9 cases (25 percent). Four of those cases ultimately resulted in exonerations, with the wrongfully-convicted men having served a collective 43 years on death row.

92.     The report also examined an additional 25 non-capital cases "in which allegations of evidence suppression were made." "In 19 of these cases, courts found favorable evidence was indeed withheld, and in all others the court deemed that the allegations warranted an evidentiary

hearing." Four men were later determined to be innocent and released from life sentences, "having served 70 collective years." Ten others had their convictions reversed.

93.     Despite the Supreme Court's condemnation, District Attorney Connick "saw no need, occasioned by Kyles, to make any changes" to OPDA's policies or customs as to the disclosure of Brady material. Connick's successor, District Attorney Eddie Jordan, who held the office at the time of Mr. Smith's arrest, confirmed that "the previous administration had a policy of keeping away as much information as possible from the defense attorney." As described by an OPDA prosecutor, "[t]he policy was 'When in doubt, don't give it up.'"

94.     Jordan's successor, District Attorney Leon Cannizzaro, had worked as an assistant prosecutor under Connick for five years, ultimately serving as chief of the OPDA trial division. Cannizzaro became District Attorney in 2008 and led OPDA during its prosecution of Mr. Smith and OPDA's continued post-conviction suppression of Brady material in his case.

95.     In the years immediately preceding Mr. Smith's 2010 trial, multiple courts made findings of Brady violations by OPDA.

96.     In August 2007, the United States District Court for the Eastern District of Louisiana granted a habeas petition where OPDA had violated Brady when it failed to disclose a supplemental report as well as other information favorable to the defense. Robinson v. Cain, 510 F.Supp.2d 399 (E.D. La. Aug. 31, 2007).

97.      In January 2008, another section of the Eastern District granted a habeas petition where OPDA had failed to provide a defendant with witness statements that directly refuted the prosecution's primary theory of the case. Perez v. Cain, 2008 WL 108661 (E.D. La. Jan. 8, 2008).

98.     In July 2008, the Court of Appeals for the Fifth Circuit instructed the federal district court to grant a habeas petition where OPDA had violated its Brady obligations by failing to

provide the defense with pretrial witness statements that contradicted trial testimony. Mahler v. Kaylo, 537 F.3d 494 (5th Cir. 2008).

99.     That same month, the Orleans Parish Criminal District Court maintained its grant of a new trial for John Duncan based on OPDA's failure to disclose impeachment evidence in the form of contradictory pretrial statements.

100.     And in March 2010, just weeks after Mr. Smith's trial, the Orleans Parish District Court granted a new trial to Michael Anderson following his August 2009 conviction and death sentence, finding OPDA had suppressed the video-recorded statement of their lone eyewitness and had failed to provide the defense with information including a beneficial plea agreement negotiated between OPDA and another of its witnesses.

101.     OPDA's Brady violations in the 2009 Anderson prosecution also resulted in complaints filed with the Louisiana Attorney Disciplinary Board against at least five assistant district attorneys as well as District Attorney Cannizzaro himself.

102.     A similar complaint was submitted to the Office of Disciplinary Counsel related to OPDA's prosecution of Jamaal Tucker from 2008 through 2011, alleging OPDA's suppression of Cannizzaro's role in securing a sentence reduction for the prosecution's witness. The complainant explained: "Cannizzaro is a win-at-all costs prosecutor. His people aim as close to the line as they can get, and when you do that, you miss it." In 2011, after Mr. Tucker moved for a new trial on the basis of OPDA's Brady violations, OPDA joined the defense in a motion to vacate Mr. Tucker's conviction and sentence.

103.     In Mr. Tucker's case, two of the prosecution's witnesses had been given benefits by OPDA in return for their testimony. After one of the witnesses wrote a letter to OPDA requesting money and assistance with his own criminal case in Lafayette Parish, Cannizzaro

personally called that district attorney's office and arranged for the witness to be given the opportunity to withdraw his guilty plea. The witness was ultimately released. This information was never turned over to Mr. Tucker's trial counsel, and the jury never learned that two witnesses had been given deals facilitated by OPDA in return for their testimony.

104.    In January 2012, in <u>Smith v. Cain</u>, the United States Supreme Court once again reversed a capital conviction due to OPDA's failure to disclose <u>Brady</u> material to the defendant. At issue in that case was OPDA's non-disclosure of information impeaching an eyewitness that was the prosecution's only evidence linking the defendant to the crime.

105.    At the 2014 trial of Christopher Wells, OPDA failed to disclose notes from prior interviews with State witnesses until after their testimony. These statements revealed that a third-party suspect had been in possession of the gun at the time of the shooting, not Mr. Wells. "The trial judge stated that 'the <u>Brady</u> violation is there' and agreed that the information should have been disclosed earlier."

106.    And in 2016, in yet another case of <u>Brady</u> withholding, OPDA waited until the day before trial to disclose that the State's testifying eyewitness had initially picked someone other than the defendant out of the photo lineup. Louisiana's Fourth Circuit Court of Appeal condemned the untimely disclosure of favorable evidence: "We do not approve of untimely disclosure of exculpatory information by the state. Late disclosure invites trial delay and risks reversal."

107.    Elected to succeed Cannizzaro in 2020, Defendant Jason Williams' administration vowed to introduce a policy of "open file discovery and information sharing" that was "starkly different than that of the previous administrations," and acknowledged that OPDA would also need to do more: "You can't just tell someone to stop doing the same thing they've been doing for years, and expect that to be enough."

108.    Williams offered that he would develop "written policies that articulate and explain at a granular level, which is expected from an [assistant district attorney] . . . in terms of their ongoing obligation" to provide favorable information to defendants.

109.    Further, Williams recognized the "increasing public awareness of [Cannizzaro's] office's inequitable legal practices and skepticism about the improprieties of his policies," and described Cannizzaro's "focus" as "quantity of convictions over quality."

110.    Upon taking office, Williams encountered a "lack of order and lack of systems [that] really speaks to how this place has operated for a very long time." "It speaks to how the wrong person gets arrested and gets prosecuted and convicted."

### OPDA's Unconstitutional Written Policy

111.    At all times relevant to this action, any written policy maintained by OPDA regarding the disclosure of <u>Brady</u> material to defendants was insufficient, inaccurate, and a violation of the constitutional requirements applicable to OPDA, in that it (a) misrepresented what type(s) of information prosecutors were obligated to disclose, (b) failed to adequately provide for all sources, locations, and forms of such information, and (c) did not offer accurate or sufficient direction as to when and/or how the mandated disclosures were to occur.

112.    The known or obvious consequence of this policy was the violation of the constitutional rights of the defendants OPDA prosecuted.

113.    Indeed, in 2011, the year after Mr. Smith's trial, District Attorney Cannizzaro responded to a reporter's question about OPDA's failure to turn over <u>Brady</u> material in another case by asserting that the defendant never requested the material, and "[i]f he doesn't, we're not obligated to give it to him." This erroneous statement, which is incorrect under clear U.S. Supreme Court precedent, comprises part of the official policy of OPDA and has resulted in numerous <u>Brady</u>

violations. In the discussed case, OPDA had failed to disclose until mid-trial the existence of a favorable plea deal OPDA made with its main eyewitness that was explicitly predicated on the witness's testimony—a similar violation of the defendant's constitutional rights by OPDA to that perpetrated against Mr. Smith.

114.   Ultimately, District Attorney Connick admitted that OPDA's written policy is "not comprehensive" and "doesn't say anything about favorable" information. Similarly, District Attorney Cannizzaro has testified that the written policy is inconsistent with the constitutional obligations of prosecutors to disclose favorable information to a criminal defendant.

## OPDA's Unconstitutional Unwritten Policy

115.   At all times relevant to this action, OPDA has maintained and carried out an unwritten policy or custom of not disclosing favorable information to defendants it prosecuted.

116.   The known or obvious consequence of this policy or custom was the violation of the constitutional rights of the defendants OPDA prosecuted.

117.   The existence of this unwritten policy or custom is demonstrated by publicly available information in cases in which a court has determined that OPDA failed to disclose favorable information to a defendant it prosecuted in violation of Brady.

118.    Based on that publicly available information, OPDA has failed to provide such constitutionally-required disclosures in at least 46 cases, not including Mr. Smith's.

119.   In 36 of these 46 cases, the court's finding of OPDA's Brady violations occurred prior to Mr. Smith's trial in February 2010.[2]

_____

[2] In addition, OPDA has acknowledged Brady violations in at least 8 other cases, sometimes negotiating plea agreements in exchange for retraction of the Brady allegation. And in at least 5 more cases, credible allegations of Brady violations were recognized, but the court granted relief on other grounds.

120.    Over half of these 46 cases involved OPDA's failure to disclose statements that witnesses made prior to trial that were either inconsistent with a witness's trial testimony or otherwise impeached the testimony of OPDA witnesses, one of the same forms of constitutional violations that OPDA committed in Mr. Smith's case.

121.    Similarly, over 10 of the 46 cases involved OPDA's failure to disclose evidence implicating the involvement of an alternate suspect in the crime for which the defendant was being prosecuted, yet another of the forms of constitutional violations that OPDA committed in Mr. Smith's case.

122.    Others of these cases involved OPDA's failure to provide information regarding benefits OPDA provided to prosecution witnesses, once again a form of constitutional violation that OPDA committed in Mr. Smith's case.

123.    The above-described instances of OPDA's failures to disclose favorable information to defendants it prosecuted understates the actual number of times that OPDA has violated the constitutional rights of defendants in this way. This is because: (1) a violation of a defendant's right to the disclosure of favorable information is inherently difficult to detect because, by definition, it involves the suppression of information, and (2) upon information and belief, the vast majority of cases filed by OPDA resolve by guilty plea and without trial, reducing the likelihood that the existence of unproduced Brady material is discovered either pre-trial or during post-conviction proceedings. Additionally, other instances may have occurred in which a court determined that OPDA violated Brady but no opinion was publicly reported. Other courts have granted relief on other grounds in cases where Brady violations occurred. And in yet other cases, loss or destruction of the OPDA file has prevented Brady violations from later being exposed.

**OPDA's Failures of Training, Supervision, and/or Discipline**

124.    OPDA failed to adequately train, supervise, and/or discipline its prosecutors with respect to their constitutional obligation to provide material, favorable evidence to defendants.

125.    As described above, any written Brady policy of OPDA inaccurately explained OPDA's obligations. And OPDA maintained an unwritten policy or custom of violating the constitutional rights of the defendants it prosecutes by failing to disclose information that is favorable to them.

126.    Former OPDA prosecutors have testified that they do not recall receiving any training on their Brady obligations.

127.    And former District Attorney Connick testified that he personally "stopped reading law books" and "looking at opinions" when he led OPDA.

128.    OPDA failed to utilize checklists, audits, reviews, or coordinators to ensure that its prosecutors complied with their Brady obligations.

129.    And OPDA did not provide "any training or instruction concerning the Victim Witness Assistance Division," despite the fact that, under District Attorney Cannizzaro, "the DA's office . . . dramatically expanded the size of its Victim/Witness Assistance Unit."

130.    OPDA also failed to discipline prosecutors who violated their Brady obligations, reinforcing its unwritten policy or custom and incentivizing continued violations of defendants' constitutional rights.

131.    OPDA and its policymakers were aware or should have been aware that OPDA prosecutors repeatedly violated their Brady obligations and needed training, supervision, and/or discipline on how to comply with their constitutional duties to prevent future, similar violations, like those that occurred in Mr. Smith's prosecution.

132.     Despite the litany of OPDA's <u>Brady</u> violations, OPDA failed to take adequate measures to prevent future violations. It did not create an adequate written <u>Brady</u> policy. It did not eradicate its unwritten policy or custom as to nondisclosure of material, favorable evidence to defendants. And it did not train or supervise OPDA prosecutors as to their <u>Brady</u> obligations, nor discipline OPDA prosecutors who violated <u>Brady</u>.

## FIRST CAUSE OF ACTION – 42 U.S.C. § 1983

**(Defendant Jason Williams, in his official capacity as District Attorney of Orleans Parish)**

133.     Mr. Smith incorporates all preceding paragraphs by reference as if fully set forth herein.

134.     As stipulated by OPDA and determined by the Orleans Parish Criminal District Court, OPDA, acting under color of law, withheld from Mr. Smith exculpatory information that was material to Mr. Smith's guilt or innocence of the murder of Jason Anderson.

135.     In doing so, OPDA violated Mr. Smith's due process rights guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution.

136.     At all times relevant to this action, OPDA maintained an unconstitutional written policy, officially adopted and promulgated by OPDA and the heads of OPDA, with respect to OPDA's obligations to disclose favorable information to defendants it prosecuted.

137.     At all times relevant to this action, OPDA maintained an unconstitutional unwritten policy, practice, custom, and/or usage of failing to disclose favorable information to defendants.

138.     The existence of these policies or customs is revealed by numerous cases in which a court has determined, or OPDA has acknowledged, that OPDA failed to disclose favorable information to a defendant, as well as by statements from OPDA representatives.

139.     At all times relevant to this action, OPDA failed to provide adequate training and/or supervision of OPDA prosecutors with respect to OPDA's obligation to disclose favorable information to the defendants it prosecuted, despite OPDA's awareness of many prior instances in which it violated <u>Brady</u> and despite the fact that it was known and/or obvious that such training and supervision was required in order to prevent other <u>Brady</u> violations, such as in Mr. Smith's case. This failure to train and supervise was sufficiently common and well-settled that it constituted a custom that fairly represented OPDA's official policy of not complying with its obligation to disclose favorable information to the defendants it prosecuted.

140.     OPDA and its policymakers were on actual or constructive notice that the above-described official policies or customs failed to protect the rights of Mr. Smith and other defendants like him under the United States Constitution to the disclosure of favorable information, but were deliberately indifferent to the known and/or obvious consequence that constitutional violations would result from these official policies or customs.

141.     The policies or customs set forth above were the moving force that caused the deprivation of Mr. Smith's right under the United States Constitution to the disclosure of favorable information that was material to Mr. Smith's guilt or innocence.

142.     As a result of OPDA's violations of Mr. Smith's constitutional rights, Mr. Smith was wrongfully convicted for a crime he did not commit and imprisoned for nearly 14 years.

143.     The conduct set forth above was the cause in fact and proximate cause of Mr. Smith's injuries and damages.

## SECOND CAUSE OF ACTION – LOUISIANA REVISED STATUTE § 22:1269

### (Defendants ABC Insurance Companies 1-10)

144.    Mr. Smith incorporates all preceding paragraphs by reference as if fully set forth herein.

145.    Defendants ABC Insurance Companies 1-10 may have issued and currently have in effect one or more policies of insurance covering former District Attorneys, Defendant Williams, and/or OPDA with regard to the actions complained of herein and obligating Defendants ABC Insurance Companies 1-10, jointly and/or severally, to pay on behalf of Defendant Williams and/or OPDA any sums the insureds may become obligated to pay Mr. Smith or to indemnify Defendant Williams and/or OPDA for any sums the insureds may become obligated to pay Mr. Smith.

146.    As described above, Defendant Williams, as the representative of OPDA, is liable to Mr. Smith for all damages sustained by Mr. Smith, costs, and reasonable attorney's fees. Defendants ABC Insurance Companies 1-10 are contractually obligated to pay all sums on behalf of Defendant Williams and/or OPDA or to indemnify the insureds for these sums.

147.    Pursuant to Louisiana Revised Statute § 22:1269(B), Mr. Smith brings a direct action against Defendants ABC Insurance Companies 1-10 to recover any and all sums they are obligated to pay on behalf of their insureds or for which they are obligated to indemnify their insureds.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kaliegh Smith requests that this Court enter judgment against Defendants and issue the following relief:

a. A declaratory judgment that Defendant Jason Williams, in his official capacity as District Attorney for Orleans Parish, violated Plaintiff Kaliegh Smith's rights guaranteed by the United States Constitution;

b. On the First Cause of Action, against Defendant Jason Williams, in his official capacity as District Attorney for Orleans Parish, compensatory damages in an amount to be determined at trial, costs, and reasonable attorney's fees pursuant to 42 U.S.C. § 1988;

c. On the Second Cause of Action, against Defendants ABC Insurance Companies 1-10, an amount equal to any and all sums they are obligated to pay Mr. Smith on behalf of Defendant Jason Williams and/or the Office of the Orleans Parish District Attorney, or for which they are obligated to indemnify the insureds; and

d. On both causes of action, granting Mr. Smith such other and further relief as this Court deems just, available, and proper, including but not limited to nominal or punitive damages.

## DEMAND FOR JURY TRIAL

Mr. Smith demands a trial by jury on both causes of action set forth above.

Respectfully submitted,


*/s/ Emily Washington*
Emily M. Washington, La. Bar No. 34143, T.A.
Hannah Lommers-Johnson, La. Bar No. 34944
Roderick & Solange MacArthur Justice Center
4400 S. Carrollton Ave.
New Orleans, LA 70119
(504) 620-2259 (p)
(504) 208-3133 (f)
emily.washington@macathurjustice.org
hannah.lommersjohnson@macarthurjustice.org

*Attorneys for Plaintiff Smith*


Dated: May 27, 2022