**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| KALIEGH SMITH, )<br><br>                    Plaintiff, )<br><br>         v. )<br><br>JASON WILLIAMS, in his official capacity )<br>as District Attorney for Orleans Parish, and )<br>ABC INSURANCE COMPANIES 1-10, )<br><br>                    Defendants. ) | Civil Action No. 22-01550<br><br>SECTION "G"<br>CHIEF JUDGE NANNETTE<br>JOLIVETTE BROWN<br><br>MAGISTRATE "4"<br>JUDGE KAREN WELLS ROBY |

## PLAINTIFF SMITH'S OPPOSITION
## TO DEFENDANT WILLIAMS' MOTION TO DISMISS

NOW INTO COURT, through undersigned counsel, comes Plaintiff Kaliegh Smith who

files this Opposition in response to Defendant Williams' Motion to Dismiss.[1]

### I.        PROCEDURAL AND FACTUAL BACKGROUND

The Orleans Parish District Attorney (OPDA) prosecuted Kaliegh Smith for a murder he

did not commit. Despite multiple witnesses having implicated a different man as the murderer,

OPDA did not disclose this information to Smith and did not investigate this alternate suspect.

OPDA pursued only Smith. In doing so, OPDA paid thousands of dollars in rent for its lead

witness, Cynthia Shezbie. By the time of Smith's trial, Shezbie had recanted her identification of

Smith and told OPDA that he was not the shooter. She also repeatedly told OPDA that she did not

want to testify for the prosecution. When trial commenced and Shezbie still did not want to testify,

OPDA obtained a material witness warrant for her arrest and told her that she "could either go to

court or go to jail." In the middle of trial, OPDA privately promised to pay more rental costs for

---

[1] ECF 5.

1

Shezbie. Shezbie then testified for the prosecution. Despite having stated that Smith was "definitely not the guy" just days prior, Shezbie testified she saw Smith at the murder scene. OPDA never disclosed the thousands of dollars it had paid for its lead witness. Smith was convicted, sentenced to life in prison without the possibility of parole, and served nearly 14 years.

OPDA secured this wrongful conviction in violation of the rights guaranteed to Smith by the Fourth and Fourteenth Amendments to the United States Constitution requiring the disclosure of all exculpatory and impeachment evidence. As a result of his wrongful conviction and imprisonment, Smith suffered injuries few in our society could imagine.

In 2021 OPDA confessed that it had violated Smith's constitutional rights by wrongfully withholding material, favorable evidence. OPDA stipulated that it had not disclosed the thousands of dollars paid for Shezbie or the witness statements implicating another man as the murderer. OPDA further confessed that Smith's conviction was unworthy of confidence, and asked the trial court to grant his motion to vacate.

Plaintiff filed his Complaint on May 27, 2022.[2] On August 5, 2022, Defendant Williams moved to dismiss.[3] Citing the Fifth Circuit's recent decision in *Daves v. Dallas County*,[4] Defendant's sole argument is that the District Attorney acts as an arm of the state when creating OPDA policies regarding evidence suppression and disclosure (rather than acting on behalf of Orleans Parish), and therefore may not be held liable for resulting rights violations under § 1983.

This argument is novel. Defendant Williams attempts to insulate all of OPDA's actions from suit by claiming that they arose "in connection to" a state function of prosecuting state crimes.[5] But that argument is wrong. Under *Daves*, and the U.S. Supreme Court precedent on

---

[2] ECF 1.
[3] ECF 5.
[4] 22 F.4th 522 (5th Cir. 2022) (en banc).
[5] ECF 5-1 at 9.

which it is based (*McMillian*),[6] state law must grant a municipal entity the power to act, at times, as an arm of the state before any of its acts can be attributed to the state. Under Louisiana law, district attorneys are not vested with state power, their acts are never the responsibility of the state, and their actions cannot be controlled by the state. *Daves* further instructs that a local entity acts on behalf of the state only when performing an act that is itself the execution of the state-specific function in question (e.g. the act of setting bail, which is the execution of the state function of setting bail). *Daves* does not discuss – let alone insulate from § 1983 liability – all acts stemming from local office policies that simply have some "connection" to a state function. OPDA's office-specific evidentiary non-disclosure policies do not execute any state function, but rather govern OPDA's actions relative to the Federal constitutional obligations under *Brady v. Maryland*.[7]

Defendant's argument that OPDA's suppression of evidence owed to Plaintiff was an act of the state for which he cannot be held liable under § 1983 rests on a distortion of the law of the Fifth Circuit[8] and of the U.S. Supreme Court.[9] Defendant's Motion to Dismiss should be denied.

## II.     LEGAL STANDARD

Dismissal under Rule 12(b)(6) is disfavored and rarely granted.[10] Under the 12(b)(6) standard, "[a] court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff."[11] Courts generally confine their analysis under Rule 12(b)(6) to the complaint and its proper attachments.[12] A plaintiff must plead enough facts

---

[6] *McMillian v. Monroe Cnty., Ala.* 520 U.S. 781 (1997).
[7] *Brady v. Maryland*, 373 U.S. 83 (1963). These obligations apply to all criminal cases, regardless of jurisdiction.
[8] *Burge v. Parish of St. Tammany,* 187 F.3d 469 (5th Cir. 1999); *Daves v. Dallas Cnty., Texas*, 22 F.4th 522 (5th Cir. 2022).
[9] *McMillian v. Monroe Cnty., Ala.* 520 U.S. 781 (1997).
[10] *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982).
[11] *Advocacy Ctr. for Elderly & Disabled v. Louisiana Dep't of Health & Hosps.*, 731 F.Supp.2d 583, 589 (E.D. La. 2010), citing *Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228, 239 (5th Cir. 2009); *Baker v. Putnal,* 75 F.3d 190, 196 (5th Cir. 1996)); *Hale v. King*, 642 F.3d 492, 498-99 (5th Cir. 2011) (en banc).
[12] *Id.*

3

"to state a claim for relief that is plausible on its face."[13] A claim is "plausible on its face" when the pleaded facts allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."[14] Even if a plaintiff's complaint is found deficient under Rule 12(b)(6), the proper remedy is usually to allow the plaintiff to amend the complaint to cure any deficiencies, rather than to dismiss with prejudice.[15]

## III.    LAW AND ANALYSIS

Defendant Williams' sole argument underlying his Motion to Dismiss is that OPDA acted as an arm of the state rather than as a local government entity in creating the policies at issue in this case. Thus, this Court should draw the reasonable inference that Defendant performed the misconduct and caused the harm alleged. This Opposition is confined to the question of whether Defendant may be held liable as a local entity under § 1983 for deploying the evidentiary suppression and non-disclosure policies that violated Plaintiff Smith's rights.

> ### A.    The Fifth Circuit's holding in *Burge* is dispositive and controlling: Louisiana district attorneys act as local policymakers for purposes of § 1983 liability when they promulgate evidence disclosure policies.

Contrary to the representation made by Defendant Williams, in *Burge v. Parish of St. Tammany*, the Fifth Circuit answered the sole question posed by this Motion to Dismiss: Louisiana district attorneys act for the local government on the particular issue of evidence disclosure policies and may be held liable under § 1983 in an "official capacity" suit.

Plaintiff Burge brought a civil damages action against a Louisiana district attorney under § 1983, alleging that the office's policies led to the suppression of exculpatory evidence in violation

---

[13] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007).
[14] *Id.*
[15] *Public Health Equip. & Supply Co. v. Clarke Mosquito Control Equip., Inc.*, 410 Fed. Appx. 738, 740 (5th Cir. 2010) (finding district court erred in denying plaintiff's motion to amend complaint after Rule 12(b)(6) dismissal).

of Burge's constitutional rights and resulted in his wrongful imprisonment for a crime for which he was later exonerated.[16] That, in short, is this case.

In discussing Burge's official-capacity claims against the district attorney, the Fifth Circuit initially addressed Eleventh Amendment immunity, relying on existing circuit precedent to swiftly conclude that Louisiana district attorneys were not immune as state actors.[17] But the Fifth Circuit's analysis did not end there.[18] Rather, the court of appeals then turned to whether Burge's official capacity claim against the district attorney met the requirements for *Monell* liability.[19] First and foremost, this inquiry involved the application of controlling U.S. Supreme Court precedent handed down the previous year in *McMillian v. Monroe County, Ala.*,[20] recognizing that the "Supreme Court's cases on the liability of local governments under § 1983 instruct us to ask whether governmental officials are policymakers for the local government in a particular area, or on a particular issue, and that our inquiry is dependent on an analysis of state law."[21] Specifically, the court asked "what entity is liable under § 1983 in an "official capacity" suit for a district attorney's policies that cause constitutional torts related to the suppression of material evidence favorable to criminal defendants."[22]

---

[16] *Id*. at 457-58.

[17] *Id*. at 466, citing *Mairena v. Foti*, 816 F.2d 1061, 1064 n.1 (5th Cir. 1987), and *Hudson v. City of New Orleans*, 174 F.3d 677, 680-81 (5th Cir. 1999).

[18] *See id*. at 468-71 (discussing § 1983 liability). The court's analysis of Eleventh Amendment immunity had concluded. *Id*. at 466.

[19] *Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658 (1978).

[20] 520 U.S. 781, 783 (1997). *See Burge*, 187 F.3d at 468-71. "*Monell* claims are limited to those against local government units that are not considered part of the State for Eleventh Amendment purposes." *Id*. at 466 n.5, citing *Monell*, 436 U.S. at 691 n.54. As with *Burge*, in *McMillian* itself, the petitioner brought a *Monell* claim (against the sheriff of Monroe County, Alabama). While the parties agreed that the defendant was a policymaker for § 1983 purposes, they disagreed as to whether he was a policymaker for the county or the state.

[21] *Burge*, 187 F.3d at 468, citing *McMillian*, 520 U.S. at 786. The Fifth Circuit understood that it was "required to undertake such an inquiry," despite the fact that there was "no dispute between the parties as to the issues." *Burge*, 187 F.3d at 469.

[22] *Id*. at 469.

In this context, the *Burge* court made the following findings guided by *McMillian*: (1) "[u]nder the Louisiana Constitution and laws, a district attorney, like a sheriff, is virtually an autonomous local government official;"[23] (2) "the entity liable for the torts of a district attorney's employees under state law is the office of the district attorney as an independent local government entity;"[24] and (3) "constitutional and statutory provisions indicate that a district attorney is the independent and final official policymaker for all the administrative and prosecutorial functions of his office."[25]

Having considered "Louisiana constitutional and statutory law and tort cases," the Fifth Circuit concluded "that, in a suit against a district attorney in his official capacity under § 1983 for constitutional torts caused by the district attorney's policies regarding the acquisition, security, and disclosure of *Brady* material, a victory for the plaintiff imposes liability on the district attorney's office as an independent local entity."[26] This holding, reached in analysis of § 1983 liability not Eleventh Amendment immunity, squarely forecloses the argument advanced by Defendant.[27]

    **B.**    **Defendant's argument also fails when analyzed directly under *McMillian*; application of Louisiana law to the agency and policy at issue in this case compels the opposite result to that reached in *Daves* and *Arnone*.**

Defendant improperly dismisses *Burge* and instead relies only on *Daves* and *Arnone v. County of Dallas*.[28] In *Daves*, the Fifth Circuit en banc stated that "Section 1983 litigation requires

---

[23] *Id*.

[24] *Id*.

[25] *Id*.

[26] *Id*. at 470. Ultimately, the *Burge* court held that the plaintiff failed to meet the "official policy" requirement of *Monell* where he did not show that "the District Attorney deliberately disregarded a need for additional policies, training, and procedures to insure the acquisition of *Brady* materials from the Sheriff's Office, its secure distribution to the appropriate assistants, and its disclosure to criminal defendants when the evidence was material to guilt or punishment." *Id*. at 473. This barrier is not advanced by Defendant Williams and presents no concern for this Court.

[27] Since *Burge*, the Fifth Circuit and its district courts have continued to consider Louisiana district attorneys (and specifically OPDA) capable of being liable for damages as local policymakers under § 1983 where it is alleged that their policies result in constitutional rights violations. *See, e.g.*, *Connick v. Thompson*, 563 U.S. 51 (2011); *Morgan v. Connick*, No. 2:17-cv-5319-JTM-MBN, E.D. La.; *Singleton et al. v. Cannizzaro et al.*, No. 2:17-cv-10721-JTM-JVM, E.D. La.; *Jones v. Cannizzaro*, No. 2:18-cv-503-JTM-DPC, E.D. La.

[28] *Arnone v. Cnty. of Dallas Cnty., Texas*, 29 F.4th 262 (5th Cir. 2022).

us to identify the level of government for which an official was acting when establishing the policy that is relevant to the claims."[29] To determine this, the *Daves* court posed and answered two essential questions.[30] First, could, at times, county judges in Texas act for the state?[31] The court considered multiple factors and ultimately concluded that it was "[m]ost relevant . . . that Texas law divides state judicial power among the different courts," meaning that it was possible for county judges to, at times, act on behalf of the state.[32]

Second, the *Daves* court asked whether the county judges were acting on behalf of Texas rather than the county when they created the policy at issue in the case.[33] In other words, did the judges' creation of the bail schedule execute a state function under Texas law?[34] *Daves* answers that setting bail is a state function derived from Texas law: "bail is a right granted by the [Texas] state constitution . . . and the process for determining bail is controlled by state statutes."[35] Thus, the defendants' actions in creating a bail schedule executed the state function of setting bail that Texas law had vested defendants with state power to perform.

Applying *Daves* here requires answering the two questions posed to determine whether Defendant acted on behalf of the state in the events outlined in the Complaint. First*,* under Louisiana law, can the Orleans Parish District Attorney, at times, act as an arm of the State of Louisiana?[36] Even if the answer to this question is yes, *Daves* requires the second question: are the specific facts pled in this case one of those times? Specifically, in creating the policies at issue in

---

[29] *Daves v. Dallas Cnty., Texas*, 22 F.4th 522, 533 (5th Cir. 2022), citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989).

[30] *Daves'* analysis also began with a preliminary question that is inapplicable to this case. *Id.* at 534.

[31] *Id.* at 534 ("we explain that the state constitution and statutes compel a finding that defendant County Judges act for the state at times").

[32] *Id.* at 537 (emphasis omitted).

[33] *Id.* at 534 ("we determine that creation of a bail schedule is one of those times").

[34] *Id.* at 538-39 ("The final step in our analysis is to decide if creating this bail schedule was a judicial act that applied state law.").

[35] *Id.* at 540.

[36] *Id.* at 536-38.

this case, was the District Attorney executing a state function that the state vested power in him to execute and over which state law has explicit purview?[37] This brief will address these two questions below in Section 1, and Section 2, respectively.

After *Daves* was decided, the Fifth Circuit decided *Arnone*, citing to *Daves*, and once again analyzing 1) whether Texas law had vested state power in a municipal defendant (the Dallas County District Attorney) to perform specific state functions at times, and 2) whether the defendant was executing those state functions by creating the policy at issue (determining when to seek state probation revocation by using polygraph tests). The Fifth Circuit answered these two questions in the affirmative, holding that the Dallas County District Attorney was not liable under § 1983 because Texas law allows district attorneys to act on behalf of the state while insulating them from municipal control, and because, by creating the policy at issue in that case, the District Attorney performed a function exclusively within the purview of the state (determining whether to pursue state probation revocation).

Attempting to secure the same result here, Defendant highlights a selection of the Texas laws in *Daves* and *Arnone* and attempts to draw comparisons with Louisiana laws referencing district attorneys.[38] Defendant asserts that "new" Fifth Circuit law provided by *Daves* and followed in *Arnone* suggests that OPDA acts as an arm of the state any time it performs any act in connection to a state criminal prosecution. Defendant further asserts that longstanding Fifth Circuit precedent that OPDA is liable as a municipality for *Brady* violations is now inapplicable to the extent that those previous decisions relied on Eleventh Amendment analysis and not § 1983 liability analysis.[39] Both of these assertions are false.[40]

---

[37] *Id.* at 540.
[38] ECF 5-1 at 11-12.
[39] *See* ECF 5-1 at 14-18.
[40] *See also* discussion of *Burge* above.

Defendant's argument distorts precedent. The analysis used in *Daves* to determine whether a local entity is acting on behalf of the state in particular circumstance is not new law—the binding precedent on this issue comes from the Supreme Court's 1997 holding in *McMillian v. Monroe Cnty., Ala.*,[41] on which both *Daves* and *Arnone* are based.

In *McMillian*, the Supreme Court detailed the factors to be consulted in determining whether a defendant has been vested with state power and is subject to the control of the state, not the municipality, and thus acts, at times, as an arm of the state. A simple comparison of the wording of select Louisiana laws to the wording of select Texas laws does not tell us whether the state has intentionally vested Defendant with state power free from municipal control. Rather, application of the *McMillian* factors decides the first of the two questions posed by *Daves*.

**1. *Daves* Step One: Under Louisiana law, the Orleans Parish District Attorney does not act as an arm of the state in performing any functions.**

The U.S. Supreme Court in *McMillian* held that a municipal defendant cannot be sued under § 1983 if the state <u>intentionally</u> vests a defendant with state power to perform a state function and if the acts underlying the suit are the execution of that state function. The Supreme Court directed that this "inquiry is dependent on an analysis of state law."[42]

In *McMillian*, the Supreme Court examined whether Alabama sheriffs were empowered to act on behalf of the state when performing certain state functions. The Supreme Court analyzed the development of Alabama law to determine whether there was <u>clear legislative intent</u> to allow sheriffs to act, at times, as state officials. The Supreme Court determined that the development of Alabama's Constitution, case law, and statutes evinced an intent that Alabama sheriffs be defined

---

[41] 520 U.S. 781 (1997).

[42] *Id.* at 786.

as state officials when performing the state function of law enforcement. In reaching this conclusion, the Supreme Court found the combination of three factors to be dispositive.

The first factor the Supreme Court looked at in *McMillian* was whether state law explicitly vests the municipal entity with state power. Here, the Supreme Court did not have to look further than the fact that county sheriffs were enumerated in the exhaustive list of executive officers of the state by the Alabama Constitution, along with the governor and a handful of other officials.[43]

The second factor analyzed in *McMillian* was whether historical development of state laws indicated the legislative intent that the defendant be considered an official who acts on behalf of the state. *McMillian* highlighted that Alabama's Constitution had been amended to add sheriffs to the state executive department, which was recognized as evidence of intent to vest sheriffs with state executive power.[44] The Supreme Court also found it to be pivotal that in Alabama, "tort claims brought against sheriffs based on their official acts . . . constitute suits against the State, not suits against the sheriff's county," which was "strong evidence" that sheriffs at times act on behalf of the state, not the county.[45]

The third factor examined in *McMillian* was whether the state rather than the municipality can exert power to control the defendant's actions. *McMillian* clarified that while funding source alone does not answer the ultimate question of whether an entity acts for the state, it can be significant in determining whether the defendant's acts are controlled by the state or municipality.[46] Under Alabama law, "the county lacked discretion to deny the sheriff operational funds below what was reasonably necessary"[47] and thus could not wield financial pressure to

---

[43] *Id.* at 787.

[44] *Id.* at 789 ("Critically for our case, the Alabama Supreme Court has interpreted these provisions [of state law] and their historical background as evidence of 'the framers' intent to ensure that sheriffs be considered executive officers of the state.'"), quoting *Parker v. Amerson,* 519 So.2d 442, 444 (Ala. 1987).

[45] *Id.*, citing *Parker*, 519 So.2d at 443-45.

[46] *McMillian*, 520 U.S. at 790-91.

[47] *Id.* at 791 (internal quotations omitted).

control the sheriff's actions. In contrast, Alabama officials had "control over how the sheriff fulfills his law enforcement duty," including the power to issue orders to the sheriff and set his salary.[48]

Additionally, the Supreme Court examined who had the power to remove the defendant sheriff, and thus whether the implied threat of removal by the state or the municipality could control the defendant's actions.[49] Removal power had been taken from the county and given to the Governor of Alabama,[50] which the Supreme Court found to be additional evidence that the state, not the county, had control over acts by the sheriff.

The Supreme Court ultimately determined that due to this combination of three factors— the explicit vesting of state power in the defendant, the legislative intent to allow the defendant to act for the state and make the state responsible for those actions, and the state's ability to control actions by the defendant—the county sheriff at times acted as an arm of the state. An application of these factors to the case at hand compels the opposite result.

> a. **Under *McMillian*, the Orleans Parish District Attorney is a municipal entity that may not act as an arm of the state in the performance of any of the District Attorney's functions.**

Applying the *McMillian* factors to this case, it is apparent that Louisiana courts and legislators have explicitly indicated that OPDA <u>does not</u> act as an arm of the state even when prosecuting state crimes: Defendant Williams is not explicitly vested with state power; Louisiana law has been developed to exclude the Defendant from those individuals for whose actions the state takes legal responsibility; and Orleans Parish, not the State of Louisiana, has the means to control the actions of Defendant through both funding and threat of removal.

---

[48] *Id.* ("While the county commission thus has no direct control over how the sheriff fulfills his law enforcement duty, the Governor and the attorney general do have this kind of control" because the sheriff's salary is set by the legislature, and the Governor and attorney general had the power to issue orders to the sheriff.).
[49] *Id.* at 788–89.
[50] The Alabama Constitution had been amended to move the power to impeach county sheriffs from the county courts to the State Supreme Court, for the purpose of augmenting the power of the Governor. *Id.*

a) *The Louisiana Constitution does not vest any state power in district attorneys.*

First, under the Louisiana Constitution, parish district attorneys are not vested with state power from any of the three branches. Art. 2 § 1 of the Louisiana Constitution states: "The powers of government of the state are divided into three separate branches: legislative, executive, and judicial." Within each of these branches, the Louisiana Constitution enumerates the exhaustive list of state officials in whom the powers of each branch are vested.[51] District attorneys are not vested with the powers of any branch.[52]

Defendant's brief attempts to make much of the fact that the Louisiana Constitution addresses district attorneys in a subsection under Article 5, which is entitled "Judicial Branch."[53] Defendant characterizes this editorial choice as vesting district attorneys with the state power of the judicial branch.[54] But this is contradicted expressly by the text of Article 5 of the Louisiana Constitution which states "judicial power is vested in a supreme court, courts of appeal, district courts, and other courts authorized by this Article." That district attorneys are not listed in this provision is significant because, in state constitutional interpretation, the Louisiana Supreme Court applies "[t]he settled doctrine of statutory construction Expressio Unius est Exclusio Alterius [which] dictates that when the legislature specifically enumerates a series of things, the legislature's omission of other items, which could have easily been included in the statute, is deemed intentional."[55] Article 5 cannot be read, consistent with this principle, as vesting state judicial power in district attorneys. Additionally, district attorneys are not mentioned in the

---

[51] Art. 3 § 1 (A) Legislative Power of State; Art. 4 Executive Branch; Art. 5 §1 Judicial Power.
[52] *Id.*
[53] ECF 5-1 at 10. District attorneys are indeed discussed in a subsection under Article 5, as are jurors, coroners, the grand jury, and others, none of whom Defendant argues are vested with the state power of the judicial branch.
[54] *Id.*
[55] *Jackson v. City of New Orleans*, 2012-2742 (La. 1/28/14), 144 So.3d 876, 888 n.8 (emphasis added).

constitutional description of any other branch nor included in the enumerated officials in whom those branches' powers are vested.[56]

Likewise, the provisions establishing that district attorneys will be elected by each district and "shall have charge of every criminal prosecution by the state in his district" simply describe the responsibilities of the district attorneys without vesting them with state power, much like other provisions describing the responsibilities of Louisiana parishes, which clearly do not vest state power in them.[57]

The fact that the Louisiana Constitution does not vest the state power of any of its three branches in district attorneys is in stark contrast to the application of this factor in *McMillian*, as discussed above, as well as in *Daves*, in which the Fifth Circuit found it to be of imperative significance that the Texas Constitution explicitly vested the state's judicial branch power in the defendant judges: "The judicial power of this State shall be vested in . . . County Courts . . . and in such other courts as may be provided by law."[58]

Regarding *Arnone*, the Texas Constitution does not explicitly vest the powers of any of its branches in the defendant district attorneys, similar to the Louisiana Constitution. However, the Fifth Circuit in that case weighed heavily the two other *McMillian* factors. These two factors, compel a much different result under Louisiana law, as discussed in the next two subsections.

---

[56] Louisiana's state power, divided into the three branches, is vested in an exhaustive list of state officials within each branch, none of which include district attorneys. The two other branches in whom state power is divided, the Legislative and Executive Branches, similarly enumerate the officials in whom their branches' state powers are vested, and also do not vest any executive or legislative state powers in district attorneys. Art. 3 § 1 (A) Legislative Power of State; Art. 4 Executive Branch.

[57] For example, Art. 6 § 10 establishes the responsibility of the governing authority of each parish to establish a code of municipal ordinances. This designation of duties to each municipality does not connote that the municipality then operates with state power when creating municipal ordinances.

[58] Tex. Const. art. V, § 1; *Daves* at 537 (holding that the defendant statutory county court judges are derivative of county courts and are "other courts as may be provided by law" and thus were explicitly vested with state judicial power by this provision of the Texas Constitution).

       b) *Louisiana law has been intentionally developed to make clear that district attorneys cannot act as an arm of the state.*

Under the second *McMillian* factor, the historical development of Louisiana law demonstrates the clear intent that district attorneys do not act on behalf of the state. Unlike Alabama law as discussed in *McMillian*, Louisiana laws expressly provide that the state is not liable for any acts of district attorneys, no matter the function served by the act.

Louisiana lawmakers enacted La. R.S. §§ 42:1441.1 and 42:1441.2 establishing that the state is not vicariously liable for "parish officials," and specifically naming district attorneys in the list of parish officials. The revised statutes contain several versions of this command. La. R.S. § 1441.2, which is titled "Nonimposition of master-servant liability on state by Civil Code Article 2320 and other laws for torts of parish officials," specifically references district attorneys (which are named in Article V Section 26) as one of the parish officials for whom the state is not liable:

> Civil Code Article 2320 and other laws imposing liability on a master for the offenses and quasi offenses of his servant shall not extend or apply to and shall not impose liability upon the state for the offenses and quasi offenses of any of those public officers named in **Article V, Sections 26**, 27, 28, and 29, and Article VII, Section 24, of the Constitution of Louisiana or any of their officers, deputies, assistants, employees, appointees, designees, or representatives.[59]

Additionally, La. R.S. § 1441.1, titled "Nonimposition of master-servant liability on state by Civil Code Article 2320 and other laws for torts of persons not designated state officials, officers, or employees by R.S. 13:5108.2," was drafted taking similar care to clarify that acts of district attorneys are not acts for which the state is legally responsible. La. R.S. § 1441.1 bars the imposition of liability on the state for any torts committed by "persons not designated state officials, officers, or employees by R.S. 13:5108.2." Under R.S. 13:5108.2, district attorneys were

---

[59] La. R.S. § 1441.2(A) (emphasis added).

not designated as state officials, officers or employees, and accordingly the passage of La. R.S. § 1441.1 established that actions of the district attorney cannot be attributed to the state.

Significantly, R.S. 13:5108.2 was also amended to emphasize that the state is not vicariously liable for any torts committed by district attorneys. As noted above, R.S. 13:5108.2 lists "covered individuals" for whom the state can be held liable when they commit a tort in service of a state function. It does not include district attorneys. However, in 1984, the legislature took the additional step of amending R.S. 13:5108.2 to add the additional specification that "'Covered individual' does not include . . . District Attorneys."[60]

In enacting and amending these statutes, the Louisiana legislature overruled case law, including *Diaz v. Allstate,* 433 So.2d 699, 701 (La. 1983),[61] and established that, as a matter of Louisiana law, "**the District Attorney's Office is not the State and the State is not liable for the acts of the District Attorney or his employees**."[62] This is the opposite of the situation in *McMillian* and thus compels the opposite result.[63]

In both *Daves* and *Arnone*, the court was presented with no evidence of any historical development of legislative intent to bar those defendants from acting as arms of the state – quite the opposite. In *Daves*, the en banc court explored the historical development of the Texas statutory county courts and concluded that, at every point in time since the creation of the first statutory county court, Texas statute and case law established that the statutory county court was granted

---

[60] R.S. 13:5108.2(3)(b).
[61] Despite it being overruled by statute, Defendant's brief cites *Diaz* for the proposition that Louisiana recognizes district attorneys as state officials who wield state power. ECF 5-1 at 10 and 12. Defendant's brief does not mention that *Diaz* has been legislatively abrogated or address the multiple laws that have been enacted clarifying that district attorneys are "parish officials" who may not act for the state. *See, e.g.,* La. R.S. § 1441.2.
[62] *Gibson v. State*, 94–CA–0476 (La. App. 4th Cir. 10/27/94), 644 So.2d 1148, 1150 (emphasis added).
[63] *McMillian* at 789 (finding significant that the Alabama state court, in recognizing sheriffs as state officers, held "that tort claims brought against sheriffs based on their official acts therefore constitute suits against the State, not suits against the sheriff's county").

"part of the constitutional court's state judicial power" and vested with the state's judicial power.[64] In *Arnone*, the Fifth Circuit noted that Texas courts have consistently interpreted Texas law as designating Texas district attorneys as "officers of the judicial branch of government."[65] Further, unlike Louisiana's express statements that district attorneys' acts are not attributable to the State of Louisiana, Texas tort law allowing for vicarious liability of governmental units under the Texas Code makes no exception for the county court judge defendants in *Daves* or district attorneys in *Arnone*.[66] Rather, as in *McMillian*, Texas lawmakers have not excluded the actions of their county judges or district attorneys from those actions which are legally attributable to the state.

The clear legislative intent in Louisiana is the opposite of Texas: the enactment of multiple Louisiana laws directing that the state is not responsible *for any acts* made by district attorneys makes clear that district attorneys do not ever act as an arm of the state.

c)   *Under state law, Orleans Parish, not the State of Louisiana, has the ability to exert control over the acts of its District Attorney.*

The third factor given great weight by the Supreme Court is whether the state rather than the municipality has the power to control the defendant's actions in a particular area.[67] In *McMillian* the Court found that the state had the power to exert ultimate control over the sheriffs because the state set the sheriffs' salaries, the county was restricted from denying the sheriff operating funds below a reasonable amount, and the governor had the power to remove the sheriff while the county did not. The reverse is true under Louisiana law with regard to all of these considerations. Orleans Parish, not the state, has the power to exert control over actions by OPDA, particularly concerning office policy – including evidence disclosure policy.

---

[64] *Daves* at 538.
[65] *Arnone* at 269, quoting *Saldano v. Texas*, 70 S.W.3d 873, 876 (Tex. Crim. App. 2002) (en banc).
[66] Tex. Civil Practice & Remedies Code § 101.021.
[67] *Id.* at 790-92.

The budget of OPDA is made up of both municipal and state contributions.[68] Historically, the contributions by the City of New Orleans to OPDA's budget have far outstripped those made by the state, sometimes nearly doubling.[69] Moreover, as found significant in *McMillian*, Orleans Parish, but not the State, may use its budgetary power to exert control over the District Attorney.

The State of Louisiana is prohibited from using budget contributions to control district attorneys. The Louisiana Constitution bars the state from reducing its contribution to the salaries of district attorneys and their staff during each six-year term of office.[70] Thus, the State cannot threaten to reduce funding as a means of controlling acts by a district attorney during their term.

In contrast, the City of New Orleans can wield its substantial budget contributions to reward and/or punish OPDA on an annual basis for particular policies or acts, and regularly does so. OPDA's budget is proposed by the New Orleans Mayor and "must be approved by the City Council of the City of New Orleans" on a yearly basis.[71] This allows the City of New Orleans to

---

[68] "The operations of the DA's Office are highly reliant upon appropriations from the City of New Orleans and from the State of Louisiana." Financial Statements and Independent Auditor's Report, District Attorney of the Orleans Judicial District, December 31, 2014 and 2013, June 30, 2015, at 11, https://app.lla.state.la.us/PublicReports.nsf/AA6CFA5C0DC02C6386257EA4006A87A0/$FILE/0000995B.pdf.

[69] For instance, "[d]uring 2014 and 2013, the District Attorney has recognized $3,750,730 and $3,740,335, respectively, from the State for On-Behalf Payments" and "the District Attorney has recognized $6,271,671 and $6,271,671 during 2014 and 2013, respectively, for appropriations from the City of New Orleans." Financial Statements and Independent Auditor's Report, District Attorney of the Orleans Judicial District, December 31, 2014 and 2013, June 30, 2015, at 36 (see also 18), https://app.lla.state.la.us/PublicReports.nsf/AA6CFA5C0DC02C6386257EA4006A87A0/$FILE/0000995B.pdf. In 2020, the state contributed $4,077,736 in On-Behalf Payments to OPDA and $154,679 towards pensions for OPDA staff; the City contributed $7,178,029 in appropriations. Financial Statements and Independent Auditor's Report, District Attorney of the Orleans Judicial District, December 31, 2020, Oct 29, 2021, at 47 (*see also* at 18), https://app.lla.la.gov/publicreports.nsf/0/637e6ff889cffe35862587880070e359/$file/00024f16.pdf.

[70] La. Const. Art. 5 § 31 ("Reduction of Salaries and Benefits Prohibited - Section 31: The salary and retirement benefits of an attorney general, district attorney, sheriff, coroner, or clerk of the district court shall not be diminished during his term of office.").

[71] Financial Statements and Independent Auditor's Report, District Attorney of the Orleans Judicial District, December 31, 2014 and 2013, June 30, 2015, at 27, https://app.lla.state.la.us/PublicReports.nsf/AA6CFA5C0DC02C6386257EA4006A87A0/$FILE/0000995B.pdf.

adjust the budget throughout the entirety of the District Attorney's term in accordance with the municipality's satisfaction with the performance of the District Attorney.[72]

During the budget process, the District Attorney appears before the City Council to defend its past year's performance and address particular concerns raised by the City. Critically, the New Orleans Mayor and City Council have utilized budget cuts for OPDA when dissatisfied with policies enacted by the District Attorney or the way in which cases are prosecuted. For example, the District Attorney's prosecution policies that resulted in high case acceptance rates under District Attorney Leon Cannizzaro, and his policy of using documents improperly styled as subpoenas to induce witnesses to come to court and testify, have been raised by the Council and were explicitly addressed by the Council in considering whether to cut OPDA's budget. Such practices resulted in OPDA budget cuts by the City, and the improper subpoena practice ceased as soon as the Orleans electorate was made aware of it.[73]

The City Council has been direct in using its budgeting power to exert control, demanding data from the Orleans Parish District Attorney for the express purpose of reviewing his policies and performance in setting OPDA's budget. In a 2017 letter, the City Council demanded additional data for evaluating OPDA in connection with the next year's budget. The District Attorney complied, turning over 4,371 pages of documents and performance statistics to the Council by the letter's deadline.[74] The City Council has demonstrated the ability to wield significant power over the data and policies of OPDA via the City's power of the purse.

---

[72] Matt Sledge, *New Orleans City Council, DA trade barbs over budget; Cannizzaro is 'fearmongering,' councilman charges*, TIMES PIC., Sep. 20, 2017, https://www.nola.com/article_5cde93bb-131b-5049-ab95-4beedfc076d1.html.

[73] "The day The Lens reported on the [improper subpoena] practice, Cannizzaro's office announced it would stop . . . . Part of this year's budget cut was a check on Cannizzaro's practices." Charles Maldonado, *Cannizzaro receives lashing from city council for fake subpoenas, jailing witnesses and other hardball tactics*, THE LENS, Sep. 20, 2017, https://thelensnola.org/2017/09/20/cannizzaro-receives-lashing-from-city-council-for-fake-subpoenas-jailing-witnesses-and-other-hardball-tactics/

[74] Greg LaRose, *Cannizzaro sends boxes of data to New Orleans City Council*, Greg LaRose, TIMES PIC., Nov. 16, 2017, https://www.nola.com/news/politics/article_7fb337a4-52cc-5e1b-9a8d-008757b83357.html.

Defendant's brief refers to the state having some level of control over district attorneys' actions via the ability of the Attorney General to "supersede" representation in a civil or criminal matter, but the level of control exerted by the threat to occasionally take over representation of a single matter is extraordinarily minimal and pales in comparison to the power of the City to slash the District Attorney's budget in any given year. Further, under La. Const. Art. 4 Section 8, the Attorney General is only able to advise and assist in the prosecution of criminal cases "upon the written request of a district attorney," and can only intervene to replace a district attorney on a case if the Attorney General can establish cause and obtain authorization by from the court.

A recent example of the lack of control wielded by the Attorney General over the policies of a district attorney involves the decision by Defendant Williams not to prosecute the state crime of abortion.[75] The current Attorney General, while strongly objecting to this decision, has no power to change it;[76] by contrast, OPDA's policy corresponds to that enacted by the City Council.[77]

Finally, only the City, not the state, has the power to remove the District Attorney. Whereas in *McMillian* the power to impeach the sheriff had been moved from control of counties to the Governor as a means of allowing the Governor to direct the sheriff's performance, in Louisiana, it is the opposite. Orleans voters retain the "absolute right" to recall the Orleans Parish District Attorney by vote, "for any reason."[78] The State of Louisiana cannot.[79]

The District Attorney is, as a result, accountable to the Orleans citizenry for his policies, including on the specific topics of evidence disclosure and *Brady* violations.[80] In his election

---

[75] Fair and Just Prosecution, Joint Statement from Elected Prosecutors (June 24, 2022), https://fairandjustprosecution.org/wp-content/uploads/2022/06/FJP-Post-Dobbs-Abortion-Joint-Statement.pdf

[77] Jeff Adelson, *New Orleans City Council asks agencies not to use city money to prosecute abortions*, TIMES PIC., July 7, 2022, https://www.nola.com/news/politics/article_81efaae6-fe47-11ec-88b4-5b8fdf3ba805.html.

[78] *Ponds v. Treen*, 407 So.2d 671, 672 (La. 1981) ("[T]he right to recall a public official under LSA-R.S. 18:1300.1, et seq., does not turn on malfeasance, regardless of the term of office. **The electorate has an absolute right to recall public officers for any reason or no reason**.") (emphasis added).

[79] La. Const. art. 5 § 26.

[80] Policy Highlight: Robust Conviction Integrity Unit, Run With Jason,

campaign, District Attorney Williams condemned past OPDA leaders' failure "to carry out their responsibility 'to see that justice is done' when they did not turn over exculpatory evidence as required by *Brady v. Maryland*" and promising his office would "search for patterns of misconduct (e.g. Brady violations) that could lead to additional questionable convictions" and "mandat[e] that exculpatory evidence is shared with the defense as quickly as possible."[81]

The ability of the municipality of Orleans, not the state, to exert control over the District Attorney's actions presents a stark contrast to the concession in *Arnone* that Dallas County lacked such control over its district attorney's policies.[82] In *Arnone* the Fifth Circuit noted that, like the sheriff in *McMillian*, the Texas legislature wielded control over the Dallas County District Attorney's compensation and regulated prosecutorial duties.[83] The court noted that Plaintiff Arnone had not even argued that Dallas County had the power to stop its district attorney from deploying the policy at issue.[84] As shown above, the opposite is true here.

These considerations, including the City's power to set OPDA's annual budget, the state's lack of the ability to adjust state budget contributions, and the power of removal based on policies and practices being exclusively in the hands of Orleans Parish voters, makes clear that Orleans Parish, not the State of Louisiana, exerts control over the prosecutorial policies of OPDA.

Application of the *McMillian* factors reveals that, under Louisiana law, district attorneys cannot act for the state, unlike officials in Alabama (*McMillian*) or Texas (*Daves* and *Arnone*).

---

https://d3n8a8pro7vhmx.cloudfront.net/runwithjason14/pages/1116/attachments/original/1598888553/JasonWilliamsPolicyReformMemoCIU_updated.pdf?1598888553.

[81] *Id*.

[82] The Fifth Circuit in *Daves* does not address whether the state or the municipality controls the acts of the county judge defendants, despite the Supreme Court's reliance on this factor in *McMillian*. This may be the result of the fact that the Fifth Circuit found the vesting of Texas state power in the judges to be so persuasive as to be nearly dispositive on its own: "Most relevant, and analogous to the Alabama provision for sheriffs, is that Texas law divides *state* judicial power among the different courts," including the defendant county judges. *Daves* at 537.

[83] *Arnone* at 268-69.

[84] *Id*. at 269.

  **b. The Fifth Circuit's factual findings in *Hudson v. City of New Orleans*[85] also apply to the *McMillian* factors and remain undisturbed: the Louisiana legislature and attorney general treat district attorneys as local officials.**

As the Supreme Court noted in *McMillian*, it is appropriate to defer to the expertise of the Circuit Court of Appeals in interpreting the law of a state within its jurisdiction as to whether a particular defendant acts as a policymaker for the municipality or for the state.[86] In *Hudson v. City of New Orleans*, the Fifth Circuit held that Louisiana district attorneys act for the municipality, not the state. While the Hudson analysis was confined to Eleventh Amendment immunity, its findings as to how district attorneys are treated under Louisiana law apply here.

Plaintiff Smith does not dispute that "state sovereign immunity under the Eleventh Amendment presents a different issue than [local government] liability under § 1983—the first concerns whether an individual is an arm of the state generally for constitutional purposes, while the second concerns whether an individual is a local policymaker in a particular area, or on a particular issue for statutory purposes."[87] But, as the majority and the dissent in *Daves* recognized, these two matters are "related"[88] and "undeniably intertwined."[89]

Several of the *Hudson* factors assessed in deciding if a governmental body acts for the state for Eleventh Amendment immunity purposes map onto the requisite *McMillian* inquiries. Thus, the Fifth Circuit's interpretation of Louisiana law and practice to determine if district attorneys are protected by Eleventh Amendment immunity in *Hudson* overlaps with an analysis of the liability of OPDA for specific functions under § 1983.[90] And important for the application of *McMillian* to

---

[85] 174 F.3d 677 (5th Cir. 1999).

[86] *McMillian* at 786.

[87] *Daves v. Dallas County*, 22 F.4th 522, 555 (5th Cir. 2022) (en banc) (Haynes, J., dissenting) (internal quotations omitted), citing *McMillian*, 520 U.S. at 785.

[88] *Daves*, 22 F.4th 522, 532 (5th Cir. 2022) (en banc).

[89] *Id*. at 555 (Haynes, J., dissenting).

[90] In *Hudson*, the Fifth Circuit concluded that "the Orleans Parish District Attorney's office is not an arm of the state and therefore not entitled to the benefits of the Eleventh Amendment." 174 F.3d at 682. As the *Daves* dissent notes,

this case, the factual findings of the *Hudson* court remain undisturbed. For example, there, the Fifth Circuit found that "the Louisiana legislature has treated district attorneys more like representatives of the state's political subdivisions than of the state itself,"[91] and relied on recent opinions of the Attorney General that "had concluded that district attorneys and their employees are considered employees of their respective parishes."[92]

### 2. *Daves* Step Two: Evidence disclosure policies do not execute a state function, thus OPDA did not act as an arm of the state in creating them.

Because Louisiana law directs that OPDA may not, at any time, be considered to act as an arm of the state, there is no need to consider the second question posed by *Daves* regarding whether the events at issue in the instant case represent a time in which Defendant did so. However, if the Court were to find that Louisiana law does provide for the District Attorney to at times act as an arm of the state under *McMillian*, the Defendant still cannot escape liability in this case. The promulgation of the policy at issue in this case was not an instance of Defendant performing a state function over which Louisiana has exclusive purview.

Neither the Supreme Court nor the Fifth Circuit has ever held a municipality acts as an arm of the state, and is immune from § 1983 suit, simply because it enacted a policy that bears on acts that may occur *in connection* to a state function. Here, OPDA argues it is not liable for deploying a facially unconstitutional policy that violated criminal defendants' Federal rights because Plaintiff was prosecuted for a state law crime, and "any policies concerning disclosure of evidence in connection with that prosecution, and other prosecutions for state-law crimes . . . . are therefore

---

"*McMillian* is entirely consistent with *Hudson*—the *Hudson* analysis does not stop at how state law treats the official but considers three other factors along the way." *Daves*, 22 F.4th at 556.

[91] *Hudson*, 174 F.3d at 683. The *Hudson* court cites to numerous state statutory provisions and Louisiana courts case law in support of this finding. *Id*. at 685-86.

[92] *Id*. at 686. Ultimately, the *Hudson* court declined to "count [this factor] in support for, or denial of, Eleventh Amendment immunity." In this § 1983 liability analysis, it supports Plaintiff's position.

policies of the State of Louisiana."[93] There is no authority supporting this counterintuitive proposition; certainly not *Daves* nor *Arnone*.[94]

Both *Daves* and *Arnone* hold that a municipality only acts on behalf of the state in creating a policy where the policy in question executes a state-specific function.[95] In *Daves*, the Fifth Circuit directed that "deciding if judges act for Texas or Dallas County when establishing a bail schedule for their court is a question of state law as applied to *that specific function*."[96] The court found necessary to determine whether the specific function of setting bail was an enumerated state function under Texas law, derived from and enshrined in the Texas Constitution, and controlled by Texas statutes. The same is not true regarding evidence disclosure in Louisiana. Unlike the right of bail in *Daves*, the disclosure of exculpatory evidence in criminal cases is not a right created by nor addressed within the Louisiana Constitution.

In *Arnone*, the Fifth Circuit applied the en banc holding from *Daves* to a 1983 suit against the Dallas County District Attorney for its creation of a policy for determining when to pursue state probation revocation based on polygraph. In analyzing whether the defendant acted as an arm of the state in creating a policy that determined when to pursue probation revocation, the court observed, "What matters under *McMillian* and *Daves* is the specific function the policymaker exercised under state law."[97] Regarding the specific function exercised in *Arnone*, the court noted that "Arnone even concedes that Dallas County's District Attorney draws his power to seek

---

[93] ECF No. 5 at 9.

[94] *Arnone v. Cnty. of Dallas Cnty., Texas*, 29 F.4th 262 (5th Cir. 2022).

[95] *Daves* at 534-40 ("Deciding if judges act for Texas or Dallas County when establishing a bail schedule for their court is a question of state law as applied to that specific function. . . . [B]ail is a right granted by the state constitution, *id.* art. I, § 11; and the process for determining bail is controlled by state statutes, *see, e.g.*, TEX. CODE CRIM. PROC. art. 17.01–17.49"); *Arnone* at 271 ("*McMillian* and *Daves* explain that what matters is the precise 'function' that the policymaker is exercising. . . . Dallas County's district attorney draws his 'power to seek revocation of probation/deferred adjudication and an arrest warrant' from the state").

[96] (emphasis added).

[97] *Arnone* at 272 (emphasis omitted).

revocation of probation/deferred adjudication and an arrest warrant from the state."[98] The court held that the specific function of determining when to pursue state probation revocations was indeed a function derived from Texas law and thus "district attorneys act for the state when they decide to seek revocation of probation or deferred adjudication."[99] *Arnone's* holding that the initiation of a state law probation revocation constitutes a state function under state law represents a Texas-specific and function-specific scenario with no bearing on this case.

The pivotal question in the instant case regarding the function at issue here—disclosure and suppression of evidence—has not been conceded by the Plaintiff and has been left unaddressed by the Defendant. Despite Defendant's attempts to draw comparisons to *Daves* and *Arnone*, and to compare the Louisiana and Texas codal provisions regarding prosecutors' power to perform prosecutions, these comparisons fall flat because "the specific function the policymaker exercised" in the instant case is not the determination of whether to prosecute a state crime or state probation revocation. Rather, the specific function exercised by Defendant's policy is the disclosure and/or suppression of favorable evidence, which is not a state function—it is not addressed by any of the Louisiana state law provisions in Defendant's charts, nor derived from state law.

Rather, the obligations that require disclosure of favorable evidence in all criminal cases arise from the United States Constitution as directed by the United States Supreme Court in *Brady v. Maryland* and its progeny.[100] *Brady* obligations bind all prosecutors regardless of jurisdiction, and apply in every criminal case in the United States. Thus, evidentiary disclosure policies of any prosecutor's office regard adherence to the *Brady* obligations shared by all prosecutors per the

---

[98] *Id.* at 269.

[99] *Id.* at 269-70.

[100] *Brady v. Maryland,* 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 153–54 (1972); *United States v. Agurs*, 427 U.S. 97, 107 (1976); *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

Federal constitution, not adherence to any state law obligation or state crime-specific interest over which Louisiana has exclusive purview.[101]

Even if this Court were to set aside the application of the *McMillian* factors in this brief and find that, despite the text of the Louisiana Constitution, despite the effort by lawmakers to clarify that acts of district attorneys are not acts of the state, and despite the fact that control over OPDA is wielded by Orleans not the state, Louisiana district attorneys can, at times, act as an arm of the state, *Daves* and *Arnone* do not support Defendant's contention that OPDA acted as an arm of the state in this case. The specific function of Defendant's policy here—disclosure of favorable evidence—is not an explicit state function, it is a Federal obligation; it is neither derived from nor enshrined in the Louisiana Constitution, nor controlled by Louisiana statute. Under *Daves* and *Arnone*, in establishing the policy at issue, Defendant did not perform an enumerated state function, and thus Defendant did not act as an arm of the state in this case.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff pleads that Defendant's Motion to Dismiss be denied.

---

[101] The only statutory mention of the disclosure of favorable evidence within Louisiana law is the warning within Louisiana Code of Criminal Procedure Art. 723 (B) specifying that nothing within Louisiana's Code should be read as interfering with the Federal constitutional requirements of *Brady*: "Notwithstanding any provision to the contrary contained herein, the state shall provide the defendant with any evidence constitutionally required to be disclosed pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny." La. C.Cr.P. art. 723(B).

Respectfully submitted,

*/s/ Hannah Lommers-Johnson*
Emily M. Washington, La. Bar No. 34143, T.A.
Hannah Lommers-Johnson, La. Bar No. 34944
Roderick & Solange MacArthur Justice Center
4400 S. Carrollton Ave.
New Orleans, LA 70119
(504) 620-2259 (p)
(504) 208-3133 (f)
emily.washington@macathurjustice.org
hannah.lommersjohnson@macarthurjustice.org

*Attorneys for Plaintiff Smith*

Date: October 11, 2022