**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **KALIEGH SMITH** | **CIVIL ACTION** |
| **VERSUS** | **NO. 22-1550** |
| **JASON WILLIAMS, ET AL.** | **SECTION: "G"(4)** |

# ORDER AND REASONS

In this litigation, Plaintiff Kaliegh Smith, Jr. ("Plaintiff") brings a *Monell* claim[1] against Jason Williams, in his official capacity as the District Attorney for Orleans Parish ("Defendant"), on behalf of his deceased father,[2] Kaliegh Smith, Sr. ("Mr. Smith"). Plaintiff alleges that the Orleans Parish District Attorney's Office ("OPDA") secured Mr. Smith's wrongful conviction in violation of his constitutional rights by withholding material exculpatory evidence in violation of its obligations under *Brady v. Maryland*.[3]

Before the Court is Defendant's Motion for Summary Judgment.[4] Defendant argues that Plaintiff's claims fail because Plaintiff cannot present competent evidence to show that: (1) the alleged undisclosed evidence was material or favorable; (2) the OPDA's policymaker, then District Attorney Leon Cannizzaro ("Cannizzaro"), adopted or implemented an unconstitutional policy concerning *Brady* disclosures; (3) Cannizzaro acted with deliberate indifference to the rights of

---

[1] *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). "Louisiana law does not permit a district attorney's office to be sued in its own name." A plaintiff bringing a *Monell* claim against the office must "be brought against the district attorney in his official capacity." *See, Hudson v. City of New Orleans*, 174 F.3d 677, 680 (5th Cir. 1999). Plaintiff brings the instant suit against the current Orleans Parish District Attorney in his official capacity. Rec. Doc. 1 at 1.

[2] The case was originally filed by Mr. Smith on May 27, 2022. Rec. Doc. 1. After Mr. Smith passed away, Plaintiff Kaliegh Smith, Jr. was substituted as the sole intestate heir of Mr. Smith. *See* Rec. Docs. 42, 43.

[3] Rec. Doc. 1 at 1. *See Brady v. Maryland*, 373 U.S. 83 (1963).

[4] Rec. Doc. 84.

criminal defendants; or (4) Cannizzaro's conduct directly caused the alleged suppression of evidence in Mr. Smith's criminal case.[5] Plaintiff opposes the motion, arguing that he has put forth sufficient evidence to support *Monell* liability under three distinct theories.[6]

For the reasons discussed in detail below, there are facts in dispute precluding summary judgment on the *Monell* claim. Plaintiff has presented sufficient evidence to create a genuine dispute as to whether the undisclosed evidence was favorable and material, whether OPDA maintained a persistent and widespread practice of suppressing material evidence in violation of *Brady*, whether OPDA acted with deliberate indifference, and whether the alleged practice was the moving force behind the alleged *Brady* violations. Accordingly, having considered the motion, the memoranda in support and opposition, the record, and the applicable law, the Court denies the motion.

## I. Background

In December 2007, a grand jury indicted Mr. Smith on one count of second degree murder.[7] A non-unanimous jury found Mr. Smith guilty of second-degree murder on February 6, 2010, and Mr. Smith was sentenced to a term of life imprisonment without the benefit of parole.[8] The Complaint alleges that OPDA withheld material, exculpatory evidence regarding the credibility of the State's primary witness and "the possibility that a specific third-party may have been involved in or responsible for the offense."[9] According to the Complaint, in May 2021, "OPDA confessed

---

[5] *Id.*

[6] Rec. Doc. 91.

[7] Rec. Doc. 1 at 1.

[8] *Id.*

[9] *Id.* at 14.

[to the] *Brady* violations in resolution of Mr. Smith's application for post-conviction relief."[10] On May 27, 2021, a judge in the Orleans Parish Criminal District Court vacated Mr. Smith's conviction, and on June 14, 2021, the OPDA dismissed the charges.[11] Mr. Smith was released from custody after nearly 14 years in prison.[12]

On May 27, 2022, Mr. Smith filed a Complaint against Defendant in this Court.[13] Mr. Smith raised a *Monell* claim under 42 U.S.C. § 1983 against Defendant in his official capacity as the District Attorney for Orleans Parish.[14] The Complaint alleges that Defendant, former Orleans Parish District Attorneys, and their assistants acted as "final policymaker[s] . . . responsible for the unconstitutional policies or customs" causing OPDA's failure to fulfill its obligations under *Brady*.[15] The Complaint alleges that "any written policy maintained by OPDA regarding the disclosure of *Brady* material to defendants was insufficient, inaccurate, and a violation of the constitutional requirements applicable to OPDA."[16] The Complaint also alleges that OPDA "maintained an unconstitutional unwritten policy, practice, custom, and/or usage of failing to disclose favorable information to defendants."[17]

---

[10] *Id.* at 3.

[11] *Id.* at 4.

[12] *Id.*

[13] Rec. Doc. 1.

[14] *Id.*

[15] *Id.* at 2, 5, 11–15.

[16] *Id.* at 19.

[17] *Id.* at 23.

On February 14, 2025, this matter was stayed due to the death of Kaliegh Smith, Sr.[18] On May 9, 2025, Plaintiff was substituted as the sole intestate heir of Mr. Smith, and the case was reopened.[19]

On May 26, 2026, the instant Motion for Summary Judgment was filed by Defendant.[20] On June 4, 2026, Plaintiff filed a response to the motion.[21] On June 9, 2026, Defendant filed a reply memorandum in further support of the motion.[22] On June 12, 2026, Plaintiff filed a sur-reply in further opposition to the motion.[23]

## II. Parties' Arguments

### *A. Defendant's Arguments in Support of Motion for Summary Judgment*

Defendant moves for summary judgment, arguing that Plaintiff cannot produce sufficient evidence that could lead a reasonable jury to find in his favor on all elements of his claim.[24] Specifically, Plaintiff alleges that Mr. Smith's constitutional rights were violated when the OPDA failed to disclose: (1) documents contained in the Victim Witness Assistance Division ("VWAD") file reflecting payments made on behalf of eyewitness Cynthia Shezbie ("Ms. Shezbie"); and (2) statements from members of the victim's family indicating that Waton Hughes, who was allegedly with Mr. Smith at the time of the murder, may have been involved in the crime.[25]

[18] Rec. Doc. 40.

[19] Rec. Doc. 44.

[20] Rec. Doc. 84.

[21] Rec. Doc. 89.

[22] Rec. Doc. 100.

[23] Rec. Doc. 108.

[24] Rec. Doc. 84-1 at 6.

[25] *Id.* at 22–25.

In support of the motion, Defendant argues that the alleged *Brady* evidence was not favorable to Mr. Smith, was not material to the outcome at trial, and the disclosure of such evidence would not have resulted in a different verdict.[26] As it relates to information withheld regarding relocation assistance made to an eyewitness, Defendant points to the Fifth Circuit's finding in a similar case that "[t]he information about the witness protection was not favorable to [the defendant]. . . ."[27] Defendant avers that information about payment of Ms. Shezbie's relocation expenses was not favorable to Mr. Smith, and there is no reasonable probability that it would have changed the outcome of Mr. Smith's trial.[28] Defendant contends that Ms. Shezbie had no financial or personal incentive to implicate Mr. Smith in the murder because she positively identified Mr. Smith as the shooter long before discussions with OPDA about paying her expenses.[29] Defendant also asserts that Mr. Smith's defense had substantial material to impeach Ms. Shezbie, as her prior inconsistent statements regarding the alleged shooter's identity and her reluctance to testify were made known to Mr. Smith's defense counsel.[30]

As it relates to allegedly suppressed evidence regarding an alternate suspect, Defendant argues that this information was underdeveloped, conclusory, and inculpatory rather than exculpatory.[31] According to Defendant, an internal OPDA memo stated that Latasha Horace ("Ms. Horace"), the victim's fiancé, told a screening attorney that she suspected "Wathan" had something to do with the murder, and the victim's stepbrother told a prosecutor that he believed "Wathan"

---

[26] *Id.* at 20.

[27] *Id.* at 22 (quoting *United States v. Davis*, 609 F.3d 663, 695 (5th Cir. 2010)).

[28] *Id.* at 23.

[29] *Id.*

[30] *Id.* at 24.

[31] *Id.*

had "something to do" with the murder.[32] Defendant argues that, under *Brady,* there is no obligation to communicate preliminary, challenged, or speculative information.[33] Defendant avers that information about the potential involvement of Waton Hughes was not favorable to Mr. Smith because it did not exculpate him from the murder.[34] Defendant contends this evidence is inculpatory because Mr. Smith's brother testified that Waton Hughes was with them throughout the day of the murder.[35]

Even assuming that material, exculpatory evidence was not disclosed, Defendant argues that OPDA is not liable because the non-disclosure was not directly caused by an official OPDA policy.[36] Defendant avers there is no competent evidence of any official OPDA policy that caused the non-disclosure of the alleged *Brady* evidence related to Mr. Smith's case.[37] Defendant explains that Cannizzaro served as Orleans Parish District Attorney from November 2008 until January 2021, and throughout his administration, his office's policy required prosecutors to disclose all evidence that was favorable to the defense and material to guilt or punishment, including impeachment evidence, regardless of whether it was requested by the defense.[38] Although this written policy was not created until sometime after Mr. Smith's trial, Defendant cites Cannizzaro's testimony that the document reflected his office's pre-existing practices.[39] Defendant asserts that

---

[32] *Id.* at 24–25.

[33] *Id.* at 25.

[34] *Id.*

[35] *Id.*

[36] *Id.* at 26.

[37] *Id.* at 29.

[38] *Id.*

[39] *Id.* at 29–30.

the prosecution went well beyond the strict requirements of the law, producing essentially the entire NOPD investigatory file.[40]

According to Defendant, the lead trial prosecutor, Myles Ranier ("Ranier"), did not disclose the alleged *Brady* evidence in this case because he did not perceive it to be favorable to Mr. Smith.[41] Even assuming that Ranier's position was incorrect, Defendant contends there is no evidence that Ranier was following any official OPDA policy.[42] Defendant cites Ranier's testimony that he was not aware of any official OPDA policy or training stating that payments to assist a witness in relocation or information about a potential alternate or additional suspect should not be disclosed to defense counsel.[43] Defendant asserts that, to the extent any of the prosecutors erred in their assessment and disclosure of the evidence, that error is not attributable to any official OPDA policies.[44]

Even assuming that OPDA's policies were responsible for the alleged non-disclosure, Defendant argues the policies were not implemented with deliberate indifference to the rights of criminal defendants.[45] Defendant avers that the right to receive the underlying information was not clearly established in 2010, and it is not clearly established today.[46] Defendant asserts that, as of 2010, OPDA did not have any convictions vacated for failure to disclose financial assistance to witnesses or for failure to disclose any information contained in the files of the victim/witness

---

[40] *Id.* at 30.

[41] *Id.*

[42] *Id.*

[43] *Id.* at 30–31.

[44] *Id.* at 31.

[45] *Id.*

[46] *Id.*

division.[47] Defendant contends there is no jurisprudence holding that information about a potential additional or alternate suspect must be disclosed under *Brady* when there is evidence showing that the person was with the defendant at the time of the crime.[48] Defendant argues there is no basis to find that OPDA's policymakers knew that constitutional violations would "most likely result" from OPDA's policies.[49]

***B. Plaintiff's Arguments in Opposition to Motion for Summary Judgment***

In opposition, Plaintiff argues that the OPDA's admissions to violating Mr. Smith's *Brady* rights in the post-conviction case are admissible statements that give rise to genuine issues of material fact.[50] While Defendant contends that Ms. Shezbie's relocation expenses were paid by OPDA due to threats made against Ms. Shezbie, Plaintiff argues that the VWAD notes do not contain threats reported by Ms. Shezbie.[51] Plaintiff points out that a second rental payment was made on behalf of Ms. Shezbie, which is not a normal practice of the OPDA.[52] Plaintiff explains that the second rental payment was made at the direction of Cannizzaro, who met with Ms. Shezbie before she testified and told an OPDA employee to "make sure that [Ms. Shezbie] got whatever [she] needed after the trial."[53] Plaintiff contends rental payments were made by the OPDA in the total amount of $4,490.[54]

---

[47] *Id.*

[48] *Id.*

[49] *Id.* at 31–32.

[50] Rec. Doc. 91 at 7.

[51] *Id.* at 11.

[52] *Id.* at 12.

[53] *Id.* at 11.

[54] *Id.* at 13.

Plaintiff avers that OPDA's suppression of the rental payments made to Ms. Shezbie is undisputed.[55] Plaintiff explains that the issue regarding the contents of the VWAD files arose at trial after Ms. Shezbie's testimony.[56] Plaintiff further explains that Ms. Shezbie recanted her identification of Mr. Smith before trial, and to justify this recantation, Rainer elicited testimony from Ms. Shezbie that she was afraid due to threats against her.[57] At the trial, Mr. Smith's counsel asked OPDA to stipulate that the VWAD records did not reflect any reports of threats made against Ms. Shezbie or produce the file for review by defense counsel.[58] In response, Ranier stated that he reviewed the VWAD file and no exculpatory information was contained in the file.[59] Plaintiff also asserts that OPDA blocked Mr. Smith's defense attorney's attempt to call VWAD counselor Eva Johnson ("Johnson") and former assistant district attorney Tanya Faia ("Faia") as witnesses to establish that there were no reports of threats made by Ms. Shezbie.[60] Plaintiff points to a handwritten note from Bobby Freeman ("Freeman"), Chief of Trials, to Ranier stating, "No further disclosure of any info in VWA[D] file."[61]

Plaintiff argues the suppressed impeachment evidence showing the rental payments to Ms. Shezbie was favorable to Mr. Smith and material to the outcome at trial.[62] Plaintiff contends that the information about rental payments could have been used to impeach the sole eyewitness to the

---

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *Id.* at 14.

[59] *Id.* at 15.

[60] *Id.* at 15–17.

[61] *Id.*

[62] *Id.* at 18.

shooting.[63] Plaintiff avers the evidence is sufficient for a reasonable jury to find that the rental payments were material.[64] Plaintiff further avers that the Supreme Court has repeatedly held, in the context of a *Brady* claim, "the effective impeachment of one eyewitness can call for a new trial."[65] Plaintiff explains that there was no physical evidence tying Mr. Smith to the murder, Ms. Shezbie was the only eyewitness to the crime, and Ms. Shezbie previously recanted her identification of Mr. Smith.[66] Thus, Plaintiff asserts that the information about the rental payments could have been used to impeach Ms. Shezbie, could have damaged her credibility, and could have impacted the outcome of trial.[67] In any event, Plaintiff asserts that there is a dispute as to the "material" issue of whether the suppressed evidence undermines confidence in the verdict.[68]

While Defendant's memorandum cites precedent holding that evidence of victim protection was not material, Plaintiff contends that this determination is fact specific.[69] Plaintiff contends that the Supreme Court has found that "*Brady's* disclosure requirements extend to materials that, whatever their other characteristics, may be used to impeach a witness."[70] According to Plaintiff, if the VWAD file would have been disclosed, it would have impeached Ms. Shezbie's trial testimony that she received threats before trial.[71]

---

[63] *Id.*

[64] *Id.* at 18–19.

[65] *Id.* at 20.

[66] *Id.* at 21.

[67] *Id.* at 21–22.

[68] *Id.* at 22.

[69] *Id.* at 23.

[70] *Id.* (quoting *Strickler v. Greene*, 527 U.S. 263, 282 n.21 (1999)).

[71] *Id.* at 24.

Plaintiff further argues that OPDA suppressed evidence that the victim's fiancé and stepbrother both made statements implicating another man, Waton Hughes, in the murder.[72] Additionally, Plaintiffs assert that Ms. Shezbie told a detective that the victim had a disagreement with the brother of someone named April the day before the murder, and Waton Hughes is April's brother.[73] Plaintiff contends that these facts were not disclosed to Mr. Smith's defense counsel before trial.[74] Plaintiff avers that the suppressed evidence regarding Waton Hughes could have been used in the cross-examination and impeachment of Ms. Shezbie and Ms. Horace.[75] Plaintiff states that according to Fifth Circuit precedent, suppressed evidence of an alternate suspect can be material under *Brady*.[76]

Plaintiff argues that genuine issues of material fact preclude summary judgment on the issue of whether a policy, custom, or practice of OPDA was a moving force in the alleged violation of Mr. Smith's due process rights.[77] Plaintiff asserts there is evidence demonstrating that the suppression of the relocation payments and the potential alternate suspect was the direct result of: (1) OPDA's widespread custom and practice of suppressing exculpatory and impeachment evidence; (2) policies expressly stated by former District Attorney Cannizzaro and written policies in trial manuals adopted by his office; and (3) the direct actions of Cannizzaro, the policymaker, and of Freeman, the Chief of Trials, to whom policymaking authority had been delegated.[78]

---

[72] *Id.*

[73] *Id.* at 25.

[74] *Id.*

[75] *Id.* at 25–26.

[76] *Id.* at 26 (citing *Graves v. Dretke*, 442 F.3d 334, 343–45 (5th Cir. 2006)).

[77] *Id.* at 27.

[78] *Id.* at 28.

Plaintiff avers that he has presented proof from express policies and statements, directives by the policymaker and his delegate during Mr. Smith's trial, and OPDA's persistent and widespread practices from which a reasonable jury could find that the suppression was a direct result of an OPDA policy or custom.[79]

Plaintiff contends that, according to Williams' campaign website, "[c]urrent DA Cannizzaro has made it a practice not to disclose new evidence that might reveal that a past conviction was made erroneously or through misconduct by police or prosecutors."[80] Plaintiff explains that Williams confirmed in his testimony that this statement was consistent with his motivation for creating the Civil Rights Division after he became District Attorney.[81] Plaintiff asserts that these statements by Williams are sufficient for a reasonable jury to find that OPDA had a policy or practice of suppressing exculpatory evidence.[82]

Plaintiff further argues that OPDA's written *Brady* policies and Cannizzaro's public statements permitted assistant district attorneys ("ADA") to suppress exculpatory or impeachment evidence unless requested by defense counsel.[83] Plaintiff explains that OPDA produced a trial manual during former District Attorney Eddie Jordan's tenure which stated, "[t]he prosecutor must ALWAYS provide defense counsel with ANY EXCULPATORY information within his file pursuant to the Brady decision *if the defendant has requested the same*."[84] Plaintiff contends that this language was continued into the September 2009 trial manual promulgated by Freeman, the

---

[79] *Id.* at 29.

[80] *Id.*

[81] *Id.*

[82] *Id.* at 30.

[83] *Id.*

[84] *Id.* at 31.

Chief of Trials under Cannizzaro's tenure.[85] Plaintiff avers that this instruction is contrary to the Supreme Court's holding in *United States v. Agurs*,[86] wherein the Supreme Court held that criminal defendants are entitled to the production of exculpatory or impeachment evidence regardless of whether their attorney made a specific request for such evidence.[87] Plaintiff further argues that in December 2010, Cannizzaro publicly endorsed the position that his office could withhold information unless and until the defense attorney specifically requested it.[88] Plaintiff contends that the Supreme Court previously found in a similar case involving a *Brady* violation by OPDA under Cannizzaro's supervision, that certain evidence suppressed by OPDA was material and should have been disclosed, and this determination should not have been left to the judgment of the ADA.[89]

According to Plaintiff, OPDA failed to adequately change its policies and training to address its history of suppressing exculpatory and impeachment evidence.[90] Plaintiff avers that based on the history of OPDA, Cannizzaro knew, or should have known, that he had to address a major problem with his trial attorneys' compliance with *Brady*.[91]

Plaintiff opines that the directives of Cannizzaro and Freeman during Mr. Smith's trial represent OPDA's official policy for *Monell* purposes.[92] Plaintiff avers that Cannizzaro met with

---

[85] *Id.*

[86] 427 U.S. 97 (1976).

[87] Rec. Doc. 91 at 30–31.

[88] *Id.* at 31–32.

[89] *Id.* at 35–36.

[90] *Id.* at 36.

[91] *Id.* at 37.

[92] *Id.* at 38.

Ms. Shezbie before she testified, directed that she be given what she needed after the trial, and did not disclose the additional commitment to make rental payments to defense counsel.[93] Plaintiff argues that decisions and directives of Freeman to Ranier instructing him not to disclose further information from Ms. Shezbie's VWAD file, as well as instructions to file motions in *limine* to block the testimony of Johnson and Faia, are attributable to OPDA for *Monell* purposes.[94] Plaintiff asserts that the directives of Cannizzaro and Freeman directly resulted in: (1) the suppression of the VWAD file; (2) the suppression of the promise of future assistance to Ms. Shezbie; and (3) the exclusion of the testimony of the VWAD counselors, which would have been used to impeach Ms. Shezbie's testimony regarding alleged threats.[95]

Plaintiff avers that OPDA's pervasive, widespread practice of suppressing exculpatory and impeachment evidence in violation of the due process rights of criminal defendants continued through the time of Mr. Smith's trial.[96] Plaintiff states that his expert, Professor Laurie Levenson ("Levenson"), has provided a report identifying at least 68 cases involving *Brady* violations at OPDA from former District Attorney Harry Connick's tenure to the present.[97] Plaintiff explains that this includes: (1) court decisions in which convictions were reversed because of *Brady* violations; (2) cases where OPDA responded to post-convictions claims by admitting there were problems with *Brady*; (3) suppression of impeachment evidence that a witness was given an inducement; and (4) suppression of evidence of an alternate suspect.[98]

---

[93] *Id.* at 39.

[94] *Id.* at 40.

[95] *Id.* at 41.

[96] *Id.* at 42.

[97] *Id.*

[98] *Id.*

Plaintiff identifies eight cases that went to trial during the first four years of Cannizzaro's tenure that involved *Brady* issues, with six of those cases involving suppressed evidence of incentives provided to a key witness.[99] Plaintiff acknowledges that some of the cases were tried after Mr. Smith's trial, but Plaintiff argues that this does not change the evidence of an unconstitutional policy, practice, or custom of suppressing exculpatory or impeachment evidence.[100] Plaintiff asserts that the evidence raises genuine issues of material fact that the suppression of evidence in Mr. Smith's trial was the result of OPDA's unconstitutional policy, custom, or practice.[101] Therefore, Plaintiff asserts that Defendant's motion for summary judgment should be denied.[102]

### *C. Defendant's Arguments in Further Support of Motion for Summary Judgment*

In further support of the motion, Defendant argues that Plaintiff's opposition contains many assertions that are contrary to, or unsupported by, the evidence.[103] Defendant avers that no reasonable jury could find that the disclosure of the relocation assistance to Ms. Shezbie would have changed the outcome of Mr. Smith's trial.[104] According to Defendant, OPDA's assistance with Ms. Shezbie's relocation expenses does not meaningfully impeach her identification of Mr. Smith.[105] Defendant explains that Ms. Shezbie identified Mr. Smith only days after the murder, at

---

[99] *Id.* at 44.

[100] *Id.*

[101] *Id.* at 45.

[102] *Id.*

[103] Rec. Doc. 100 at 4.

[104] *Id.*

[105] *Id.* at 5.

a time when no one had promised any financial reward for doing so.[106] Defendant asserts that there is no allegation that OPDA's relocation assistance was conditioned on Ms. Shezbie providing testimony favorable to the prosecution.[107]

As it relates to undisclosed statements implicating Waton Hughes, Defendant argues that no reasonable jury could find that the disclosure of these statements would have changed the outcome at trial.[108]

While Plaintiff argues that the stipulations made by OPDA in vacating Mr. Smith's conviction are competent evidence establishing that there was a *Brady* violation, Defendant contends that materiality in the context of a *Brady* claim is a mixed question of law and fact.[109] Even assuming Plaintiff could prove a *Brady* violation, Defendant avers that doing so would not be sufficient to establish causation.[110]

While Plaintiff relies on Williams's campaign statements, Defendant argues that these statements do not establish that OPDA had a policy or practice of suppressing exculpatory evidence.[111] Defendant contends that these statements were made before Williams took office as District Attorney and cannot be construed as admissions by the OPDA.[112] Defendant asserts that

---

[106] *Id.*

[107] *Id.*

[108] *Id.* at 7.

[109] *Id.* at 7–8.

[110] *Id.* at 8.

[111] *Id.* at 9.

[112] *Id.*

Williams's campaign statements do not create any genuine dispute of fact as to whether OPDA had a policy or practice of suppressing exculpatory evidence.[113]

Defendant avers that Plaintiff has not produced evidence showing that OPDA had any facially unconstitutional policy resulting in the suppression of *Brady* evidence.[114] According to Defendant, there is no competent evidence showing that OPDA ever adopted the purported policies identified by Plaintiff.[115] Contrary to Plaintiff's assertions, Defendant contends that OPDA did not promulgate an official policy manual instructing prosecutors not to disclose *Brady* evidence unless it was requested, rather the referenced document promulgated by Freeman was "education materials for people in the Trials Division."[116] Assuming that Plaintiff could show that OPDA adopted such policies, Defendant argues that these policies were not responsible for the non-disclosure of the alleged *Brady* material.[117] Defendant points out that the referenced educational material includes instructions directing prosecutors to "make timely disclosure to the defense of all evidence or information known to the prosecutor that the prosecutor knows, or reasonably should know, either tends to negate the guilt of the accused or mitigates the offense."[118] Defendant asserts that the evidence does not show that OPDA ever adopted an official policy instructing prosecutors that they were not required to disclose *Brady* material unless requested by the defense.[119]

---

[113] *Id.*

[114] *Id.*

[115] *Id.* at 10.

[116] *Id* at 10–11.

[117] *Id.*

[118] *Id.* at 12.

[119] *Id.* at 13.

While Plaintiff references a statement by Cannizzaro wherein he stated that "his office could withhold favorable information unless and until the defense attorney requested it," Defendant argues this statement was taken out of context and was not stated in reference to OPDA's *Brady* obligations.[120] In any event, Defendant avers that defense counsel made several requests for *Brady* materials, but the lead prosecutor did not perceive the undisclosed evidence as favorable to the defense.[121]

Defendant argues that Cannizzaro did not personally prosecute the case against Mr. Smith, and he was not personally responsible for discovery or *Brady* disclosures in that case.[122] Even assuming there was a *Brady* violation in Mr. Smith's case, Defendant avers there is no evidence showing that Cannizzaro was personally responsible for the failure to disclose.[123]

While Plaintiff argues that Freeman was a policymaker, Defendant disputes this assertion.[124] Defendant contends that Plaintiff has not identified any express statement or formal action delegating policymaking authority to Freeman.[125] To the contrary, Defendant contends Cannizzaro testified in his deposition that the Chief of Trials did not have any responsibility for written policies or standards.[126] Even assuming that Freeman was authorized to decide OPDA official policy regarding discovery, Defendant argues that Freeman did not direct any prosecutor

---

[120] *Id.*

[121] *Id.* at 15.

[122] *Id.* at 20.

[123] *Id.* at 21.

[124] *Id.*

[125] *Id.* at 22.

[126] *Id.* at 23.

to suppress *Brady* evidence in Mr. Smith's case.[127] While Plaintiff references a handwritten note by Freeman instructing Ranier not to disclose any additional information from the victim/witness division file, Ranier explains that he was not specifically instructed to withhold information regarding relocation payments to Ms. Shezbie.[128]

Defendant contends that Plaintiff has not produced evidence of a "pervasive, widespread practice" of suppressing *Brady* evidence at the time of Mr. Smith's trial.[129] While Plaintiff references eight known *Brady* violations in cases tried in the first four years of Cannizzaro's administration, Defendant states that Plaintiff has not attached competent evidence or case citations to show that *Brady* violations occurred in any of the cases.[130]

While Plaintiff's expert, Levenson, opines that there were *Brady* violations in earlier cases dated back to 1967, Defendant argues that the older cases are irrelevant because they are not probative of Cannizzaro's policies that were in effect at the time of Mr. Smith's prosecution.[131]

---

[127] *Id.*

[128] *Id.* at 23–24.

[129] *Id.* at 24.

[130] *Id.* at 24–25. As it relates to a trial involving a defendant named Michael Anderson ("Anderson"), identified in Levenson's report, Defendant concedes that a motion for a new trial was granted on the grounds that *Brady* information was not provided, however, Defendant explains that this was not caused by an official policy or culture of suppressing exculpatory evidence, rather the evidence was unintentionally overlooked. As it relates to a trial involving a defendant named Christopher Wells, Defendant states that the defense's motion for a mistrial based on a purported *Brady* violation was denied by the trial court because there was no prejudice to the defense. As it relates to a trial involving a defendant named Henry Bruer, Defendant contends that the district court did not find that all the of the elements of a *Brady* violation had been met. Defendant points out that Bruer was acquitted at trial, and thus, this case should not be considered. As it relates to a trial involving a defendant named Jamaal Tucker ("Tucker"), Defendant avers there has never been any court decision finding a *Brady* violation by OPDA, rather Tucker's conviction was vacated by a joint motion based on newly discovered evidence. As it relates to a trial involving a defendant named Jeremy Burse ("Burse"), Defendant states there has never been any court decision finding a *Brady* violation by OPDA in Burse's trial. As it relates to a trial involving a defendant named Julio Ruano, Defendant asserts that Ruano's conviction was not vacated based on *Brady* violations, although *Brady* violations were raised in his post-conviction applications. As it relates to a trial involving a defendant named Robert Murray ("Murray"), Defendant contends that the appellate court overturned the trial court's denial of Murray's motion for new trial on the grounds that the State failed to correct false testimony by the witness, but no *Brady* violation was found by the court.

[131] *Id.* at 30.

Defendant contends that Plaintiff cannot prove that OPDA's policymaker acted with deliberate indifference, nor has Plaintiff shown that an alleged custom or practice is "unconstitutional on its face."[132]

### *D. Plaintiff's Sur-Reply in Further Opposition to the Motion for Summary Judgment*

In further opposition to the motion for summary judgment, Plaintiff contends that Defendant's reply memorandum raises new arguments and relies on new evidence that should have been presented in his motion for summary judgment.[133] While Defendant attaches a declaration to his reply memorandum from Graymond Martin ("Martin") indicating that he circulated a handout titled "Exculpatory Evidence: A Prosecutor's Primer" in 2009, Plaintiff contends there are no signed receipts attached demonstrating that Ranier or any other ADA received the handout.[134] Plaintiff further contends that Faia, the lead ADA in the prosecution of Mr. Smith, had no recollection of receiving this handout.[135] Martin's declaration also mentions a continuing legal education ("CLE") presentation in December 2009 informing the ADAs of their *Brady* obligations, which was allegedly attended by Ranier, however, Plaintiff states that Ranier vaguely remembered the CLE.[136] Plaintiff asserts that Martin's declaration does not eliminate genuine issues of material fact as to OPDA's policies.[137]

---

[132] *Id.* at 31.

[133] Rec. Doc. 108 at 1.

[134] *Id.* at 2.

[135] *Id.*

[136] *Id.* at 2–3.

[137] *Id.* at 3.

Plaintiff argues that a reasonable jury could conclude that the payments made on Ms. Shezbie's behalf were for her "successful" testimony.[138] While Defendant maintains that the payments made to Ms. Shezbie were for relocation expenses, Plaintiff disputes this contention and argues that a reasonable jury could find that OPDA's rental payments were conditioned on Mr. Shezbie successfully testifying for the prosecution.[139]

While Defendant argues that the "trial manual" by Freeman is not an official policy manual for the ODPA, Plaintiff contends this document was provided by Defendant in response to Plaintiff's request for "any and all documents containing any instruction, policy, practice, or procedure of OPDA related to evidentiary disclosure and/or obligations under *Brady*."[140]

While Defendant contends that Plaintiff fails to provide citations or evidence of any court decisions regarding *Brady* violations during Cannizzaro's tenure, Plaintiff avers that Levenson's report includes citations to the records used in rendering her opinions regarding *Brady* violations.[141] Plaintiff asserts there is a consistent throughline of OPDA's policies of suppressing

---

[138] *Id.*

[139] *Id.* at 4–5, In support of this contention, Plaintiff points to the following: (1) Ms. Shezbie left New Orleans on October 20, 2007, to return to her residence in Georgia; (2) the first set of payments were made just two weeks before the hearing on Mr. Smith's motion to suppress Ms. Shezbie's identification; (3) OPDA paid for Ms. Shezbie's travel to New Orleans for the suppression hearing, and in her 2018 affidavit, Ms. Shezbie declared that "before trial, I was asked again to identify the shooter. I guess I picked the wrong picture, and the assistant district attorney corrected me and then I picked Kaliegh Smith's picture. After the hearing, I told the assistant district attorney, Tania (sic) Fania, that Kaliegh Smith was not the shooter;" (4) on October 14, 2009, VWAD coordinator Johnson told Ranier that "after Chezby [Ms. Shezbie] got $, stopped co-operating with us;" (5) Ms. Shezbie testified in her affidavit that "I had been asking the DA's office to help with my rent, but they never provided it," which, according to Plaintiff, demonstrated that she understood that the payments were not for relocation expenses; (6) in a meeting with Ms. Shezbie on February 4, 2010, Ms. Shezbie stated that "Mr. Cannizzaro told the woman in the room to make sure that I got whatever I needed after the trial;" (7) at trial, Ms. Shezbie explained that her previous recantation of Mr. Smith's identification was due to threatening phone calls from jail, however, Plaintiff contends that Ms. Shezbie's phone logs revealed no calls from the jail; (8) a month after trial, a VWAD staffer wrote that Ms. Shezbie "successfully testified in the trial;" and (9) after trial, OPDA paid another rental deposit and rent payment for Ms. Shezbie.

[140] *Id.* at 6.

[141] *Id.* at 7.

evidence from Harry Connick through the early years of Cannizzaro's tenure.[142] Plaintiff explains that Cannizzaro kept the same attorneys and policies he inherited from his predecessors.[143] Thus, Plaintiff contends that the motion for summary judgment should be denied.[144]

## III. Legal Standard

### *A. Summary Judgment*

Summary judgment is appropriate when the pleadings, discovery, and affidavits demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[145] To decide whether a genuine dispute as to any material fact exists, the court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."[146] All reasonable inferences are drawn in favor of the nonmoving party.[147] Yet, "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[148] If the entire record "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of fact exists and, consequently, the moving party is entitled to judgment as a

---

[142] *Id.*

[143] *Id.*

[144] *Id.* at 8.

[145] Fed. R. Civ. P. 56(a); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[146] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008) (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000)).

[147] *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Reeves*, 530 U.S. at 150).

[148] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

matter of law.[149] The nonmoving party may not rest upon the pleadings.[150] Instead, the nonmoving party must identify specific facts in the record and articulate the precise manner in which that evidence establishes a genuine issue for trial.[151]

The party seeking summary judgment always bears the initial responsibility of showing the basis for its motion and identifying record evidence that demonstrates the absence of a genuine issue of material fact.[152] "To satisfy this burden, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element of the opponent's claim or defense."[153] If the moving party satisfies its initial burden, the burden shifts to the nonmoving party to "identify specific evidence in the record, and to articulate" precisely how that evidence supports the nonmoving party's claims.[154] The nonmoving party must set forth "specific facts showing the existence of a 'genuine' issue concerning every essential component of its case."[155]

The nonmovant's burden of demonstrating a genuine issue of material fact is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations,

---

[149] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cites Serv. Co.,* 391 U.S. 253, 289 (1968)).

[150] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[151] *See id.*; *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[152] *Celotex Corp.*, 477 U.S. at 323.

[153] *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190 (5th Cir. 1991) (internal citation omitted).

[154] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994); *see also Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).

[155] *Morris*, 144 F.3d at 380; *see also Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012).

by unsubstantiated assertions, or by only a scintilla of evidence."[156] Moreover, the nonmoving party may not rest upon mere allegations or denials in its pleadings.[157]

### *B. Monell Claim*

To prevail on a *Monell* claim, a plaintiff must show "(1) an official policy (or custom), (2) that a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy (or custom)."[158] "Official policy is ordinarily contained in duly promulgated policy statements, ordinances or regulations."[159] But a custom can be evidenced by a "widespread" practice of officials or employees that, while not officially adopted or promulgated, "is so common and well-settled as to constitute a custom that fairly represents municipal policy."[160] "[E]ven a facially innocuous policy will support liability if it was promulgated with *deliberate indifference* to the known or obvious consequences that constitutional violations would result."[161] To prove deliberate indifference, a "showing of simple or even heightened negligence will not suffice."[162] Instead, "Courts of Appeals have routinely equated deliberate indifference with recklessness."[163]

---

[156] *Little*, 37 F.3d at 1075 (internal citations and quotation marks omitted).

[157] *Morris*, 144 F.3d at 380.

[158] *Moore v. LaSalle Mgmt. Co., L.L.C.,* 41 F.4th 493, 509 (5th Cir. 2022) (internal citations and quotations omitted).

[159] *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001).

[160] *Vardeman v. City of Houston*, 55 F.4th 1045, 1052 (5th Cir. 2022) (quoting *Webb v. Town of Saint Joseph*, 925 F.3d 209, 214-215 (5th Cir. 2019)).

[161] *Piotrowski*, 237 F.2d at 579 (emphasis added).

[162] *Board of Cnty. Com'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 407 (1997).

[163] *Farmer v. Brennan*, 511 U.S. 825, 836 (1994) (collecting cases).

Plaintiff must additionally demonstrate actual or constructive knowledge of the official policy or custom and that the constitutional violation's "moving force" is that policy or custom.[164] Whether the moving force behind the constitutional violation is policy or custom is proved by a "direct causal link between the municipal policy and the constitutional deprivation."[165]

## IV. Analysis

Defendant moves for summary judgment in his favor, arguing that: (1) Plaintiff cannot establish that there was a *Brady* violation in Mr. Smith's case because the alleged *Brady* material was not favorable to Mr. Smith or material to the outcome at trial; (2) even assuming that material exculpatory evidence was not disclosed, the non-disclosure was not directly caused by any official OPDA policy, custom, or practice; and (3) Plaintiff cannot show that the policymaker acted with deliberate indifference to the rights of criminal defendants. The Court considers each of these arguments in turn.

### *A. Whether Plaintiff Has Presented Sufficient Evidence from Which a Reasonable Juror Could Conclude That a Brady Violation Occurred*

Defendant argues that Plaintiff cannot establish an underlying *Brady* violation because the evidence at issue was neither favorable nor material. In *Brady v. Maryland*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused [] violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[166] The prosecutor's duty to provide favorable evidence includes impeachment evidence and exculpatory evidence.[167] The prosecutor's duty to disclose

[164] *Piotrowski*, 237 F.2d at 579.

[165] *Id.* at 580.

[166] *Brady*, 373 U.S. at 87.

[167] *United States v. Bagley*, 473 U.S. 667, 676 (1985).

evidence includes both evidence in its own possession and any other "favorable evidence known to the others acting on the government's behalf in the case, including the police."[168] "[T]he duty to disclose such evidence is applicable even though there has been no request by the accused."[169]

To prevail on a *Brady* claim, a criminal defendant must show: (1) the prosecutor suppressed evidence; (2) the evidence is favorable to the defense; and (3) the evidence is material to guilt or punishment.[170] The determinative question is whether the evidence was material; that is, whether there is a reasonable probability that, had the report been disclosed to the defendant the result of the proceeding would have been different.[171] A reasonable probability is a probability sufficient to undermine confidence in the outcome.[172] The materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state.[173] The prosecutor is not required to deliver the entire file, but only to "disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial."[174]

Defendant does not dispute that two categories of evidence were not disclosed to the defense in Mr. Smith's criminal case: (1) the VWAD file; and (2) witness statements implicating Waton Hughes. Each of the suppressed pieces of evidence is addressed in turn.

---

[168] *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

[169] *Strickler*, 527 U.S. at 263.

[170] *Miller v. Dretke*, 431 F.3d 241, 245 (5th Cir. 2005) (citing *Brady*, 373 U.S. at 87).

[171] *Wilson v. Whitley,* 28 F.3d 433, 434 (5th Cir. 1994) (citing *Bagley,* 473 U.S. at 682).

[172] *Spence v. Johnson,* 80 F.3d 989, 994 (5th Cir.), *cert. den.*, 519 U.S. 1012 (1996) (citing *Bagley,* 413 U.S. at 682).

[173] *Wilson,* 28 F.3d at 439.

[174] *Id.* at 435.

**1. The VWAD File**

The parties do not dispute that OPDA failed to disclose documents contained in the VWAD file. Defendant contends that no *Brady* violation occurred because this evidence was not favorable to the defense and not material to the outcome of the trial.

Ms. Shezbie's testimony was central to the State's case against Mr. Smith. On October 20, 2007, Ms. Shezbie was watching her grandson play in the driveway of her daughter's house when she witnessed Mr. Anderson in the street struggling with a gunman who shot him.[175] That evening, Ms. Shezbie returned to her home in Georgia,[176] telling her family "I am going, I am not coming back."[177] Several days later, NOPD detectives visited Ms. Shezbie in Georgia, where Ms. Shezbie identified Mr. Smith in a photographic array.[178]

On January 11, 2008, OPDA screening attorney Ginger Miller informed OPDA's VWAD that Ms. Shezbie wanted to transfer her Section Eight housing voucher to Georgia because she feared for her safety in New Orleans.[179] On January 13, 2008, Ms. Shezbie spoke with OPDA victim/witness coordinator Johnson to discuss these needs.[180] On January 31, 2008, Johnson wrote a letter to the Housing Authority of New Orleans requesting assistance in relocating Ms.

---

[175] Rec. Doc. 84-23 at 359–60.

[176] *Id.* at 362.

[177] Rec. Doc. 91-2 at 3.; Rec. Doc. 91-4 at 2.

[178] Rec. Doc. 84-23 at 362; Rec. Doc. 91-4 at 2.

[179] Rec. Doc. 84-5 at 1.

[180] Rec. Doc. 84-6 at 2.

Shezbie.[181] Johnson stated that Ms. Shezbie was a witness to a murder and was afraid for her safety because friends of the defendant had threatened her family.[182]

On February 7, 2008, Johnson informed Ms. Shezbie that the DA's office would assist her in paying the deposit and first month's rent for an apartment in Georgia while she was waiting for her Section Eight voucher to be transferred.[183] On February 22, 2008, ADA Faia requested and obtained permission to pay for Ms. Shezbie's flight from Georgia and back again so that she could testify at a motion hearing.[184] The memo noted that Ms. Shezbie was homeless at the time.[185] On February 29, 2008, Johnson confirmed that a check for $2,500 had been mailed to a property manager for Ms. Shezbie's deposit and first month's rent in Georgia.[186] On March 14, 2008, Ms. Shezbie appeared in criminal court for a hearing on the defense's motion to suppress her identification.[187]

On October 14, 2009, Ranier spoke to Ms. Shezbie by phone, and she told him that she did not want to testify as too many witnesses were being killed, she was "evicted, having problems," and the "DA's Office failed her."[188] Ranier then spoke to Johnson and was advised that "after Chezby [sic] got $, stopped co-operating with us."[189] On January 4, 2010, Ranier applied for a

---

[181] Rec. Doc. 84-7 at 1.

[182] *Id.*

[183] Rec. Doc. 84-6 at 3.

[184] Rec. Doc. 84-8 at 1.

[185] *Id.*

[186] Rec. Doc. 84-6 at 3.

[187] Rec. Doc. 84-9 at 2.

[188] Rec. Doc. 84-10; Rec. Doc. 91-11 at 1.

[189] Rec. Doc. 91-11 at 2.

material witness bond, and the judge issued a material witness bond for Ms. Shezbie in the amount of $200,000.[190] On January 26, 2010, Ranier spoke with Ms. Shezbie again, and she stated that she was not 100% sure that Mr. Smith was the shooter; that she did not want to come to court; and that Mr. Smith was "definitely not the guy."[191]

Ms. Shezbie testified at Mr. Smith's criminal trial on February 4, 2010. According to an affidavit by Ms. Shezbie in 2018:

> Right before I testified, I was taken to a room on the third floor of the courthouse outside Section F. Leon Cannizzaro and a woman from the DA's office were there. During the meeting, Mr. Cannizzaro told the woman in the room to make sure that I got whatever I needed after the trial. The way he said it made me think he had just learned they had dropped the ball on helping me. I had been asking the DA's office for help with my rent, but they never provided it.[192]

VWAD records reflect that in March 2010 the OPDA paid $1,990 for Ms. Shezbie's deposit and first month's rent on an apartment in Slidell, Louisiana.[193] The internal memo states that "[t]here is reason to believe that she will be in danger if she stays in her current location due to the fact that she received phone calls telling her not to testify, but she successfully testified in the trial."[194]

A reasonable factfinder could find that the undisclosed rental payments on behalf of Ms. Shezbie were favorable to Mr. Smith. "[T]he character of a piece of evidence as favorable will often turn on the context of the existing or potential evidentiary record."[195] Supreme Court precedent defines evidence tending to strengthen a defense as favorable evidence under *Brady*.[196]

---

[190] Rec. Doc. 84-11 at 16.

[191] Rec. Doc. 84-12 at 1; Rec. Doc. 91-11 at 8.

[192] Rec. Doc. 91-4 at 4.

[193] Rec. Doc. 84-14; Rec. Doc. 91-12; Rec. Doc. 91-23 at 1.

[194] Rec. Doc. 84-14; Rec. Doc. 91-12.

[195] *Kyles v. Whitley*, 514 U.S. 419, 439 (1995).

[196] *Cone v. Bell*, 556 U.S. 449, 470 (2009) (collecting cases).

The Supreme Court has held evidence impeaching a prosecution witness is favorable *Brady* evidence.[197]

The VWAD file clearly contains impeachment evidence because it bears on the witness's potential bias, motives, or interest in cooperating with the prosecution.[198] "Impeachment evidence . . . falls within the *Brady* rule."[199] "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."[200] In determining whether there is a reasonable probability that the outcome of the trial would have been different, the court's focus is whether the withheld evidence contains information that could have been used, on cross-examination, to significantly undermine the witness's credibility.[201]

Defendant cites *United States v. Davis*[202] in support of his argument that the payments made on behalf of Ms. Shezbie were not favorable to Mr. Smith. In *Davis,* the New Orleans Police Department provided witness protection to a cooperating witness, which was undisclosed to the defense.[203] The Fifth Circuit found that, "[t]he information about the witness protection was not favorable to [the defendant] because the jury may have assumed that [the witness] needed

---

[197] *Bagley*, 473 U.S. at 676.

[198] *See Chiasson v. Zapata Gulf Marine Corp.*, 988 F.2d 513, 517 (5th Cir. 1993) ("Impeachment evidence, on the other hand, is that which is offered to discredit a witness ... to reduce the effectiveness of [the] testimony by bringing forth evidence which explains why the jury should not put faith in [the] testimony.'").

[199] *Bagley*, 473 U.S. at 676 (quoting *Giglio,* 405 U.S. at 154).

[200] *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959).

[201] *Bagley,* 473 U.S. at 675–76.

[202] *Davis*, 609 F.3d at 663.

[203] *Id.* at 696.

protection from [the defendant]…"[204] Additionally, the Fifth Circuit found that the undisclosed evidence was not material.[205] The court reasoned that even if the witness could have been impeached with the undisclosed evidence, "it could not have . . . changed the outcome of the trial, in light of the overwhelming evidence against [the defendant]."[206]

This case is factually distinguishable from *Davis*. During Mr. Smith's trial, the jury heard Ms. Shezbie's testimony that she previously recanted her identification because she was afraid and had received threatening calls from individuals she associated with Mr. Smith.[207] During closing argument, Ranier discussed Ms. Shezbie's fear and the alleged threats as a justification for her multiple recantations.[208] Unlike in *Davis* where the evidence was not favorable because the jury may have assumed that the witness needed protection from the defendant, in Mr. Smith's case such evidence was already before the jury. The defense could have used the VWAD file to impeach Ms. Shezbie's testimony that she recanted her testimony due to threats. Therefore, a reasonable jury could find that the VWAD file was favorable to Mr. Smith.

Furthermore, unlike in *Davis* where the impeachment evidence was not material because there was overwhelming evidence of the defendant's guilt, Ms. Shezbie was the only eyewitness to the shooting and there was no physical evidence against Mr. Smith. There was not overwhelming evidence against Mr. Smith, as evidenced by the fact that the verdict was not unanimous. "[W]hen the testimony of the witness who might have been impeached by the undisclosed evidence is strongly corroborated by additional evidence supporting a guilty verdict,

---

[204] *Id.*

[205] *Id.*

[206] *Id.*

[207] Rec. Doc. 84-23 at 365.

[208] Rec. Doc. 91-29 at 2.

the undisclosed evidence generally is not found to be material."[209] "Conversely, if the impeaching evidence would seriously undermine the testimony of a key witness on an essential issue or there is no strong corroboration, the withheld evidence has been found to be material."[210]

A reasonable juror could view the payments as evidence that Ms. Shezbie received a tangible benefit from the prosecution and could therefore question whether that benefit influenced her testimony. There are fact issues in dispute precluding summary judgment on the issue of whether the suppressed VWAD file was material.

**2. Statements from Family Members**

OPDA failed to disclose statements from members of the victim's family indicating that another individual may have been involved in the murder. Specifically, OPDA's homicide charge conference review sheet was not produced before Mr. Smith's trial. It documents an interview that ADA Ginger Miller ("Miller") had on December 17, 2007, with Latasha Horace, the victim's fiancée. Miller reported that, among other things, Ms. Horace stated:

> "Wathan," the brother of her [Ms. Horace's] best friend, April, once told her that someone had a hit out on the victim. He said he wouldn't do it because she and April were close. She suspects that Wathan had something to do with the victim's murder. Wathan is ▲'s best friend.[211]

Casey Collins, the victim's stepbrother, also told OPDA investigators that "Wathan" had "something to do w[ith] it."[212] Further, "it appears Ms. Shezbie informed the detective that the victim had had a disagreement with the brother of someone named April the day before the murder.

---

[209] *United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004).

[210] *Id.*

[211] Rec. Doc. 91-7 at 3.

[212] Rec. Doc. 91-6 at 5.

(April's brother is an individual named Waton Hughes.) This fact was not contained in the detective's report that was passed on to OPDA."[213]

Evidence suggesting an alternative suspect is potentially exculpatory and could bear directly on the defense's ability to challenge the State's theory of the case. The Fifth Circuit has held that withholding evidence of another suspect was a *Brady* violation, particularly when the evidence linking the defendant to the crime was limited.[214] On the other hand, the Fifth Circuit has also held there was not a *Brady* violation every time the government does not disclose an alternative suspect, especially when the other suspect was not a particularly plausible one.[215]

Defendant contends this evidence is inculpatory because Mr. Smith's brother testified that Waton Hughes was with them throughout the day of the murder. Ms. Shezbie testified that she witnessed Mr. Anderson in the street struggling with a single gunman, who shot him.[216] Ms. Horace also testified that she saw a man running away wearing clothing that matched Ms. Shezbie's description of the shooter.[217] Therefore, the evidence presented at trial suggested that only one perpetrator was involved, and evidence suggesting that the perpetrator was Waton Hughes would be exculpatory to Mr. Smith. A reasonable jury could conclude that statements identifying another possible perpetrator would have provided the defense with a basis to challenge the adequacy of the police investigation and pursue an alternative-suspect theory. Accordingly, the

---

[213] *Id.*

[214] *See, e.g., Graves,* 442 F.3d at 343–44.

[215] *See, e.g., Spence,* 80 F.3d at 998–99 (holding there was no *Brady* violation when, even if the defense counsel had had information about the other suspect at trial, the prosecution would have been able to "exonerate[e]" the other suspect with other facts).

[216] Rec. Doc. 84-23 at 359–60.

[217] *Id.* at 186–89.

Court concludes that a genuine issue of material fact exists as to whether the undisclosed statements constituted favorable and material *Brady* evidence.

The evidence presented against Mr. Smith at trial was not overwhelming. The State produced no physical evidence linking Mr. Smith to the murder, and its case rested largely upon one eyewitness's testimony, whose credibility could have been impeached with the undisclosed evidence. Moreover, the jury's verdict was not unanimous, demonstrating that on the evidence presented, some jurors harbored doubt regarding Mr. Smith's guilt. Although a non-unanimous verdict itself does not establish materiality, it is relevant to the Court's assessment of the strength of the State's case and whether the suppressed evidence could have affected the outcome of the trial.

The Court concludes that a reasonable jury could find the suppressed evidence favorable and material. The materiality inquiry must consider the cumulative effect of the suppressed evidence rather than evaluating each item in isolation.[218] Considering the cumulative effect of the suppressed evidence, together with the absence of physical evidence connecting Mr. Smith to the crime and the non-unanimous nature of the verdict, a reasonable factfinder could conclude that there exists a reasonable probability that disclosure of the evidence would have altered the result of Mr. Smith's trial.

---

[218] *See Wilson*, 28 F.3d at 439 ("In assessing the materiality of undisclosed impeachment evidence, 'we must consider the nature of the impeachment evidence improperly withheld and the additional evidence of the defendant's guilt independent of the disputed testimony.'") (citing *United States v. Weintraub,* 871 F.2d 1257, 1262 (5th Cir. 1989)).

### *B. Whether Plaintiff has Presented Evidence upon which a Reasonable Juror Could Conclude that OPDA Maintained a Policy, Custom or Practice of Permitting Brady Violations*

To succeed on a *Monell* claim, Plaintiff must present facts to establish Cannizzaro had actual or constructive knowledge of an official policy, practice, or custom of similar constitutional violations. Plaintiff argues that he has put forth sufficient evidence to support *Monell* liability under three distinct theories:

> (1) OPDA had a widespread custom and practice of suppressing exculpatory evidence; (2) OPDA maintained unconstitutional policies by using an improperly narrow definition of constitutional disclosure obligations as expressed by Cannizzaro and as written in trial manuals adopted by OPDA; and (3) the direct actions of Cannizzaro, the policymaker, and of Freeman, the Chief of Trials, to whom policymaking authority had been delegated.

Establishing an official policy, practice, or custom can be done in one of three ways. First, there may be a policy that is "officially adopted and promulgated" by the municipality or an official within the municipality with policymaking authority.[219] Second, there may be a "persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy."[220] A persistent, widespread practice may include allegations that a policymaker failed to act affirmatively, "if the need to take some action to control the agents of the local governmental entity 'is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymake[r] … can reasonably be said to have been deliberately indifferent to the need.'"[221] A policymaker with policymaking authority

---

[219] *Burge v. Par. of St. Tammany (Burge II)*, 336 F.3d 363, 369 (5th Cir. 2003).

[220] *Id.*

[221] *Burge v. Par. of St. Tammany (Burge I)*, 187 F.3d 452, 471 (5th Cir. 1999) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

must have actual or constructive knowledge of the custom.[222] Third, "a single decision by a policy maker may, under certain circumstances, constitute a policy for which a municipality may be liable."[223] In this case, Plaintiff argues that there is evidence to support a *Monell* claim under all three options.

### 1. Whether OPDA Officially Promulgated or Adopted an Unconstitutional Policy

Plaintiff asserts that OPDA maintained official unconstitutional policies, as expressly written in a September 2009 "trial manual" which included an improperly narrowed definition of constitutional disclosure obligations. Plaintiff attaches an exhibit containing the alleged trial manual.[224] The document is not titled, but "Robert L. Freeman, Jr., Chief of Trial" and "September 2009" are displayed on the front page, along with an official OPDA seal bearing Leon A. Cannizzaro, Jr.'s name.[225] The "trial manual" states as follows: "[t]he prosecutor must ALWAYS provide defense counsel with ANY EXCULPATORY information within his file pursuant to the Brady decision *if the defendant has requested the same.*"[226]

Plaintiff alleges that this language was promulgated by Freeman, the Chief of Trials, during Cannizzaro's tenure. Plaintiff avers that this instruction is contrary to the Supreme Court's holding in *United States v. Agurs*,[227] wherein the Supreme Court held that criminal defendants are entitled

---

[222] *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010) (internal citations omitted).

[223] *Id.* (quoting *Brown v. Bryan Cnty., OK*, 219 F.3d 450, 462 (5th Cir. 2000)).

[224] Rec. Doc. 91-37.

[225] *Id.* at 1.

[226] *Id.* at 7.

[227] *Agurs*, 427 U.S. at 107–08, 110–11.

to the production of exculpatory or impeachment evidence regardless of whether their attorney made a specific request for such evidence.

In response, Defendant contends that OPDA did not promulgate an official policy manual instructing prosecutors not to disclose *Brady* evidence unless it was requested, rather the referenced document by Freeman was "education materials for people in the Trials Division."[228]

In further support of his assertion that OPDA maintained an unconstitutional official policy, Plaintiff points to statements made by Cannizzaro to a reporter. When asked to justify the delay in the disclosure of certain evidence in a criminal trial, Cannizzaro responded that, "[t]he defense attorney has to request it, and if he doesn't, we're not obligated to give it to him."[229] Plaintiff avers that these statements are consistent with the written policies contained in the trial manual and are directly contrary to *Agurs.*

An official policy "usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy."[230] "An official, written policy is 'itself' unconstitutional only if it affirmatively allows or compels unconstitutional conduct."[231]

Assuming that OPDA had an official policy of instructing prosecutors to disclose *Brady* evidence upon request from the defense, Plaintiff has not shown how such a policy was the moving force behind the alleged *Brady* violation in Mr. Smith's case. "[T]here can be no municipal liability

---

[228] Rec. Doc. 100 at 11.

[229] Rec. Doc. 91-38 at 4.

[230] *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009) (quoting *Piotrowski*, 237 F.3d at 579) (quotation marks omitted).

[231] *Edwards v. City of Balch Springs*, 70 F.4th 302, 309 (5th Cir. 2023) (citing *Doe v. United States*, 831 F.3d 309, 318 (5th Cir. 2016)).

unless [an official policy] is the moving force behind the constitutional violation."[232] "In other words, a plaintiff must show direct causation, *i.e.*, that there was 'a direct causal link' between the policy and the violation."[233] Before trial, Mr. Smith's defense attorney made a written request to ADA Faia for disclosure of "all information to which [he was] entitled under *Brady v. Maryland* . . . including but not limited to the following: [a]greements/[d]eals with government witnesses, . . . [b]ias of government witnesses, . . . [and] [p]rior identifications of other suspects."[234] Thus, even if prosecutors were operating under an incorrect understanding that a request from the defense was necessary, Plaintiffs have not shown how the policy could have caused the non-disclosure in Mr. Smith's case. Accordingly, the Court concludes that Plaintiff has failed to present sufficient evidence from which a reasonable jury could find that Mr. Smith's alleged constitutional injury resulted from an official policy of OPDA. Plaintiff has not shown that the first theory of *Monell* liability is applicable to the facts of this case, and the Court proceeds to address his alternative arguments on *Monell* liability.

**2. Whether Plaintiff Has Proven Single Incident Liability**

Plaintiff next argues that OPDA is liable under *Monell* because the alleged constitutional violations resulted from decisions made by final policymakers. Specifically, Plaintiff points to evidence that: (1) Cannizzaro directed ADAs to provide Ms. Shezbie with "whatever she needed after trial"; and (2) Freeman, the Chief of Trials, instructed the lead prosecutor not to disclose additional information contained in the VWAD file. Plaintiff contends that these directives constitute official policies attributable to OPDA.

---

[232] *James,* 577 F.3d at 617.

[233] *Id.* (quoting *Piotrowski*, 237 F.3d at 578).

[234] Rec. Doc. 100-12.

"[A] single decision by a policy maker may, under certain circumstances, constitute a policy for which a [municipality] may be liable."[235] However, this "single incident exception" is extremely narrow and gives rise to municipal liability only if the municipal actor is a final policymaker.[236]

It is undisputed that Cannizzaro was the final authority or official policymaker regarding disclosure obligations for the OPDA. Plaintiff points to evidence that Cannizzaro directed ADAs "to make sure that [Ms. Shezbie] got whatever [she] needed after the trial."[237] However, Plaintiff has not pointed to any evidence to suggest that Cannizzaro committed a constitutional violation. Cannizzaro did not personally prosecute the case against Mr. Smith, and he was not personally responsible for discovery or *Brady* disclosures in Mr. Smith's case. Cannizzaro's directives that the ADAs provide Ms. Shezbie with "whatever she needed after trial" concerns witness management, not litigation strategy or disclosure obligations. Plaintiff has not shown that Cannizzaro, the policymaker, made the ultimate decision regarding *Brady* disclosures or that he directed prosecutors to withhold evidence in Mr. Smith's case.

As it relates to actions and decisions made by Freeman, Plaintiff must show that Freeman had final policymaking authority and that he committed a constitutional violation. Defendant argues that Freeman was not a policymaker, and he was not delegated policymaking authority. Whether an official possesses final policymaking authority for purposes of municipal liability is a question of state and local law.[238] A municipal employee may also possess final policymaking

---

[235] *Brown v. Bryan Cnty.,* 219 F.3d 450, 462 (5th Cir. 2000).

[236] *Bolton v. City of Dallas,* 541 F.3d 545, 548 (5th Cir. 2008) (citing *Woodard v. Andrus,* 419 F.3d 348, 352 (5th Cir. 2005)).

[237] Rec. Doc. 91-4 at 4.

[238] *Valle*, 613 F.3d at 542.

authority where the final policymaker has delegated that authority, either expressly or impliedly.[239] Not all delegations of authority are delegations of *policymaking* authority—the Fifth Circuit has "long recognized that the 'discretion to exercise a particular function does not necessarily entail final policymaking authority over that function.'"[240]

Plaintiff has not demonstrated that Freeman possessed final policymaking authority or that he was delegated policymaking authority by Cannizzaro with respect to disclosure obligations. Although the Chief of Trials may have exercised supervisory authority over ADAs, this alone is insufficient to establish final policymaking authority for purposes of *Monell* liability. Accordingly, any alleged instruction by Freeman to withhold additional information from the VWAD file cannot, standing alone, constitute an official policy attributable to OPDA.

Accordingly, the Court concludes that Plaintiff has failed to present sufficient evidence from which a reasonable jury could find that Mr. Smith's alleged constitutional injury resulted from a single unconstitutional policy decision made by an official possessing final policymaking authority for OPDA. Plaintiff has not shown that the second theory of *Monell* liability is applicable to the facts of this case, and the Court proceeds to address his third argument on *Monell* liability.

---

[239] *See Zarnow v. City of Wichita Falls*, 614 F.3d 161, 167 (5th Cir. 2010).

[240] *Valle*, 613 F.3d at 542–43 (quoting *Bolton v. City of Dallas*, 541 F.3d 545, 549 (5th Cir. 2008) (per curiam)); *see Zarnow*, 614 F.3d at 167 ("There is a fine distinction between a policymaker and a decisionmaker."); *Bennett v. City of Slidell*, 728 F.2d 762, 769 (5th Cir. 1984) (en banc) ("Policymakers act in the place of the governing body in the area of their responsibility; they are not supervised except as to the totality of their performance.").

**3. Whether Plaintiff Has Shown OPDA a "Persistent, Widespread Practice" of Withholding Exculpatory Evidence**

Plaintiff argues that OPDA had a "persistent, widespread practice" of withholding exculpatory evidence as "there were at least 68 cases involving documented *Brady* violations at OPDA."[241]

To succeed on this claim, Plaintiff must demonstrate that there was a "persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy," and prove Cannizzaro had actual or constructive knowledge of that custom.[242] Where an alleged custom or practice "is unconstitutional on its face, it necessarily follows that a policymaker was not only aware of the specific policy, but was also aware that a constitutional violation will most likely occur."[243] However, where the alleged custom or practice "is facially innocuous, establishing the requisite official knowledge requires that a plaintiff establish that [the custom or practice] was 'promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result."[244] The alleged custom or practice at issue here—withholding exculpatory evidence—is unconstitutional on its face. Therefore, a finding of deliberate indifference is not required. Moreover, even if a finding of

---

241 Rec. Doc. 91 at 42.

242 *Burge II*, 336 F.3d at 369.

243 *Id.* at 370 (quoting *Piotrowski*, 237 F.3d at 579).

244 *Id.* (quoting *Piotrowski*, 237 F.3d at 579).

deliberate indifference is required, there are facts in dispute which would preclude summary judgment on that issue.[245]

"A customary policy consists of actions that have occurred for so long and with such frequency that the course of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct."[246] A plaintiff must demonstrate "a pattern of abuses that transcends the error made in a single case."[247] Establishing a pattern "requires similarity and specificity; prior indications cannot simply be for any and all bad or unwise acts, but rather must point to the specific violation in question."[248] "A pattern also requires sufficiently numerous prior incidents as opposed to isolated instances."[249]

In her report, Levenson has identified 45 cases where a *Brady* violation was adjudicated by the courts, eight cases where she found that "OPDA's conduct amounted to admission of *Brady* claims," nine cases where she found "credible *Brady* claims resolved on other grounds," and 23 cases where she found that OPDA acknowledged it had withheld evidence favorable to the defense.[250] Leon Cannizzaro served as District Attorney from 2008 through 2021, and Mr. Smith was tried and convicted in 2010. To establish a pattern, Plaintiff primarily relies on eight cases that were tried during the first four years of Cannizzaro's tenure (2009–2013).

[245] *See Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003) ("To satisfy the deliberate indifference prong, a plaintiff usually must demonstrate a pattern of violations. . . .'"). As discussed in great detail herein, there is evidence upon which a reasonable juror could rely to find a pattern of similar violations.

[246] *Zarnow,* 614 F.3d at 169.

[247] *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 850–51 (quoting *Piotrowski*, 237 F.3d at 582).

[248] *Id.* at 851 (internal citation and quotation marks omitted).

[249] *Id.* (internal citation and quotation marks omitted).

[250] *Id.*

In his reply memorandum, Defendant argues for the first time that Plaintiff has failed to establish a persistent and widespread practice of *Brady* violations sufficient to support *Monell* liability.[251] Defendant argues that the older cases that pre-date Cannizzaro's tenure are irrelevant because they are not probative of Mr. Cannizzaro's policies that were in effect at the time of Mr. Smith's prosecution. Plaintiff responds to this argument, asserting that Cannizzaro maintained the same policies and employees as Harry Connick, the former District Attorney.

The Court is not persuaded by Defendant's argument that its analysis must be limited to cases tried during Cannizzaro's tenure. Plaintiff's theory is that OPDA maintained a longstanding institutional custom of *Brady* noncompliance that predated Cannizzaro's administration and persisted throughout his tenure. Under Plaintiff's theory, evidence of similar *Brady* violations occurring before Cannizzaro assumed office is relevant to whether OPDA maintained a persistent and widespread practice that continued during Mr. Smith's prosecution. The fact that similar *Brady* violations continued unabated in the years before Mr. Smith's case constitutes powerful circumstantial evidence of the unconstitutional policy, practice, or custom in place at OPDA during Mr. Smith's prosecution.[252] Although Defendant relies on *Flanks* in support of his argument that only cases arising under the same final policymaker may be considered, in *Flanks* the Court relied on several cases that pre-dated the Connick administration.[253]

The Fifth Circuit has explained that a municipal custom is established through a pattern of misconduct that "must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the

---

[251] The Court granted Plaintiff leave of Court to file a sur-reply to address the newly raised arguments.

[252] *See, e.g., Jones v. Cannizaro*, No. 18-503, 2021 U.S. Dist. LEXIS 13312, at *15 (E.D. La. Jan. 21, 2021).

[253] *Flanks v. City of New Orleans*, No. 23-6897, 2025 WL 3264438, at *12, n.190 (E.D. La. Nov. 24, 2025).

expected, accepted practice of city employees."[254] A pattern requires similarity, specificity, and sufficiently numerous *prior* incidents.[255] Plaintiff alleges that OPDA maintained a longstanding institutional practice of suppressing *Brady* material, and so evidence predating Cannizzaro's administration may be probative of whether such a custom existed and whether it continued during Mr. Smith's prosecution. Accordingly, the Court will consider the *Brady* cases identified by Levenson that predate Cannizzaro's tenue to the extent they are sufficiently similar and otherwise relevant to Plaintiff's *Monell* theory.

Next, Defendant takes issue with the eight cases that were tried during the first four years of Cannizzaro's tenure (2009–2013): (1) Michael Anderson; (2) Christopher Wells; (3) Henry Bruer; (4) Ronald Warner; (5) Jamaal Tucker; (6) Jeremy Burse; (7) Julio Ruano; (8) Robert Murray.

As to Michael Anderson, Defendant concedes that the district court granted a motion for new trial on the ground that *Brady* evidence was not provided, but Defendant argues that the nondisclosure resulted from an inadvertent mistake rather than an unconstitutional custom or practice. Defendant's argument is unpersuasive. The Court does not consider the Anderson matter as independent proof that OPDA maintained an unconstitutional custom. Rather, the Court considers Anderson as one data point among the pattern of evidence identified by Levenson. Whether the *Brady* violation resulted from negligence, inadvertence, or intentional misconduct does not render the case irrelevant to the Court's widespread practice analysis. As the Supreme Court explained, "suppression by the prosecution of evidence favorable to an accused [] violates due process where the evidence is material either to guilt or to punishment, irrespective of the good

---

[254] *Peterson*, 588 F.3d at 850 (quoting *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir. 1984) (en banc)).

[255] *Id.* at 851 (emphasis added).

faith or bad faith of the prosecution."[256] Accordingly, Defendant's characterization of the *Brady* violation in Anderson's case as inadvertent does not diminish its relevance as evidence that a *Brady* violation occurred.

As it relates to Christopher Wells, Henry Bruer, Jamaal Tucker, Jeremy Burse, Julio Ruano, Robert Murray, and Ronald Warner, Defendant contends that there were no judicial findings that a *Brady* violation occurred. Defendant contends that these cases should not be considered because Plaintiff has not attached competent evidence to show that credible *Brady* claims were asserted in these cases. The Court finds this argument unpersuasive. Levenson's report includes citations to the records she reviewed to reach this opinion. To the extent Defendant disagrees with Levenson's conclusion that credible *Brady* claims were raised in these cases, this is a factual dispute that cannot be resolved on a motion for summary judgment. The issue of whether Levenson relied upon adequate information goes to the weight to be assigned to her testimony, as it involves the bases and sources upon which she relied in reaching her conclusions.

Plaintiff has presented sufficient evidence to create a genuine dispute of material fact regarding the existence of a persistent and widespread practice of *Brady* violations within the OPDA. Plaintiff's expert identified a total of 85 cases involving alleged *Brady* violations, with eight of those cases occurring during the first four years of Cannizzaro's administration. Thus, the record reflects a substantial number of alleged *Brady* violations occurring over an extended period.[257]

Moreover, the cases identified involve categories of suppressed evidence substantially similar to the evidence at issue here. Specifically, the identified cases concern the suppression of

---

[256] *Brady*, 373 U.S. at 87.

[257] *See e.g.*, *Flanks v. City of New Orleans*, No. 23-6897, 2025 WL 660037, at *10 (E.D. La. Feb. 28, 2025) (finding that 22 cases in an 11-year period was sufficient to find a custom of *Brady* violations).

impeachment evidence—including witness inducements, prior inconsistent statements, and other credibility-related material—or the suppression of evidence identifying or implicating an alternative perpetrator. While Defendant argues that none of the cases involve the failure to disclose financial assistance to a witness or information contained in victim/witness division files, this degree of specificity is not required. Exact similarity between cases is not mandatory to find a policymaker was on notice of similar Constitutional violations, with the Fifth Circuit noting the "specificity required should not be exaggerated."[258] Courts in this Circuit look for prior acts that are "fairly similar to what ultimately transpired" in the case before them.[259]

On a motion for summary judgment, the Court must view the evidence in the light most favorable to Plaintiff, as the non-moving party, and draw all reasonable inferences in his favor.[260] So construed, based on the evidence discussed above, the Court finds that a reasonable jury could find that the *Brady* violation resulted from a "persistent, widespread practice of [OPDA], which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy," and that Cannizzaro had actual or constructive knowledge of that custom.[261] Therefore, there are facts in dispute precluding summary judgment on the third theory of *Monell* liability.

---

[258] *Estate of Davis ex rel. McCully v. City of North Richland Hills,* 406 F.3d 375, 383 (5th Cir. 2005).

[259] *Id.*

[260] *Turner*, 476 F.3d at 343 (quoting *Reeves*, 530 U.S. at 150).

[261] *Burge II*, 336 F.3d at 369. Based on the same evidence of a pattern of violations, a reasonable juror would be able to find deliberate indifference.

### *C. Whether Plaintiff Has Presented Evidence that the Policy or Custom is the "Moving Force" Behind the Alleged Constitutional Violation*

To establish "moving force" causation, a "plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."[262] Critically, "[t]he causal link 'moving force' requirement and the degree of culpability 'deliberate indifference' requirement must not be diluted, for 'where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability.'"[263] Still, "'[w]here a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so,' the causation determination 'is straightforward.'"[264]

Viewing the evidence in the light most favorable to Plaintiff, the Court concludes that Plaintiff has presented sufficient evidence to create a dispute of material fact on this element. Plaintiff has presented evidence that OPDA allegedly maintained a longstanding practice of suppressing similar categories of exculpatory evidence that Plaintiff contends was withheld during Mr. Smith's prosecution. The similarity between the alleged constitutional violations permits a reasonable inference that Mr. Smith's injury resulted from the customs Plaintiff contends existed within the OPDA. Therefore, Plaintiff has presented evidence upon which a reasonable juror could find that OPDA's custom of suppressing exculpatory evidence in violation of *Brady* was the moving force behind the alleged constitutional violations Mr. Smith suffered.

---

[262] *Brown*, 520 U.S. at 404.

[263] *Covington v. City of Madisonville, Tex.*, 812 Fed. App'x 219, 225–26 (5th Cir. 2020) (quoting *Alvarez*, 904 F.3d at 390).

[264] *Jauch v. Choctaw Cnty.*, 874 F.3d 425, 435 (5th Cir. 2017) (internal citation omitted).

## V. Conclusion

For the reasons stated herein, there are facts in dispute precluding summary judgment on the *Monell* claim brought against Williams in his official capacity as District Attorney. Plaintiff has presented sufficient evidence to create genuine disputes of material fact as to whether the undisclosed evidence was favorable and material, whether OPDA maintained a persistent and widespread practice of suppressing material evidence in violation of *Brady,* whether OPDA acted with deliberate indifference, and whether the alleged practice was the moving force behind the alleged *Brady* violations. Because these issues present factual disputes that must be resolved by the trier of fact, Defendant is not entitled to summary judgment.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Jason Williams's Motion for Summary Judgment[265] is **DENIED.**

**NEW ORLEANS, LOUISIANA**, this 24th day of September, 2026.

Nannette Jolivette Brown

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

[265] Rec. Doc. 84.